JAMESON ET AL., APPELLANTS FROM DECREE OF PROBATE COURT OF CHIPPEWA COUNTY.

A will after devising the real estate of the testator, contained the following clause, viz: "It is my will that all my furniture and property be in common to my beloved wife, Elizabeth Holiday, and daughter, Jane J. Holiday, so long as they live and keep house together, and that whenever they separate or break up house keeping, that the furniture be divided between them, at their own discretion, and the stock of cattle to be given up to my beloved wife Elizabeth, for her sole use and behoof." *Held*, that a claim which the testator had against the Chippewa Indians, and which was allowed and paid over to the executor under a treaty concluded after the testator's death, between the Indians and the United States, did not pass under it to the widow and daughter.

No rule is better established, than that general words in a will may be restrained in their meaning, or rejected entirely, to carry out the intention of the testator. So general words may be construed by the particular words which follow.

APPEAL from the Probate Court of Chippewa county.

John Holiday, on 29th November, 1841, made his last will and testament as follows: "In the name of God, amen, I, John Holiday, of the

Jameson *et el.*, Appellants from Decree of Probate Court of Chippewa County.

Sault Ste. Marie, Michigan, do make and declare this my last will and testament, in manner and form as follows. First, I resign my soul into the hands of Almighty God, hoping and believing in a remission of my sins by the merits and mediation of Jesus Christ, and my body I commit to the earth, to be buried at the discretion of my executors hereinafter to be named, and my worldly estate I give and devise as follows:

"First, I give and devise and bequeath unto my beloved daughter, Mary Holt, one-third of all my lands, messuages and tenements, situate, lying and being in the state of Illinois, to have and to hold to my said beloved daughter, Mary Holt, her heirs and assigns, forever.

"Also, I give and devise and bequeath unto my beloved daughter, Jane J. Holiday, one-third of said lands, messuages and tenements, situate, lying and being in the state of Illinois, to have and to hold to my said beloved daughter, Jane J. Holiday, her heirs and assigns, forever.

"Also, I give, devise and bequeath to my beloved grand-children, John H. Jameson and Harriet Elizabeth Jameson, the remaining third of said lands, messuages and tenements, situate, lying and being in the state of Illinois, to have and to hold to the said John H. Jameson and Harriet Elizabeth Jameson, their heirs and assigns, forever. It is my wish and intent that each of said thirds or portions be so allotted, as near as practicable, good and bad lands to be in like proportions and quantities.

"Also, I give, devise and bequeath those two lots, messuages, tenements and appurtenances situate, lying and being in the village of Sault Ste. Marie, Michigan: one of which is known as the Billiard Room lot, the other adjoining it on the rear from the water on the hill, for the use and maintainance of my beloved wife, Elizabeth Holiday, during her lifetime, and at her decease to my beloved daughter, Jane J. Holiday, to her heirs and assigns, forever:

"It is my will that all my furniture and property be in common to my beloved wife, Elizabeth Holiday, and daughter, Jane J. Holiday, so long as they live and keep house together, and that whenever they separate or break up house keeping that the furniture be divided between them, at their own discretion, and the stock of cattle to be given up to my beloved wife Elizabeth, for her sole use and behoof.. Having, before the making of this my will and testament, given to my beloved daughter, Jane J. Holiday, for her sole use and benefit, a note of hand

Jameson *et al.*, Appellants from Decree of Probate Court of Chippewa County.

from L. T. Jameson, for two thousand dollars, payable on demand, and bearing date 15 June, 1841. Said note is endorsed by me and witnessed by J. L. Ord, and I hereby wish it to be hereby so taken and understood.

"As I have given to my son William, from time to time, what I think was sufficient for him, it is my express will and intent that he have nothing whatever.

"It is also my will that what I have herein devised and bequeathed as above to my beloved wife, Elizabeth Holiday, be to her in lieu of dower. And I do hereby appoint my son-in-law, Henry Holt, and my friend, William H. Brockway, as executors of this my last will and testament. In witness, &c."

After his death the will was proved and admitted to probate, and letters testamentory were granted to Brockway, one of the executors, the other declining to act. Holiday in his lifetime had a claim against the Chippewa Indians, and under a treaty made and concluded after his death, at Lapointe of Lake Superior, between Robert Stuart, United States Commissioner, and the Chippewa Indians of the Mississippi and Lake Superior, by their Chief and headmen, on the 4th October, 1842, this claim was allowed to his estate, and paid over to the executor, amounting to $3,157 10. Of this sum, after paying the debts against the estate and charges of administration, $804 68 still remained in the hands of the executor, who petitioned the probate court for an order directing him to whom to pay it. The probate court ordered it to be paid under the will to Elizabeth Holiday and Jane J. Holiday, the widow and daughter of the testator, from which order an appeal was taken to this court by John and Harriet Jameson.

*Fraser*, for appellants.

*Farnsworth and Goodwin*, for respondents.

*By the court*, WHIPPLE, C. J. The only question presented for the decision of the court, relates to the construction of the 5th clause in the will of John Holiday. On the part of the appellants, it is contended that this clause does not cover or make any disposition of the money realized by the executor under the treaty between the United States and the Chippewa tribe of Indians, entered into at Lapointe, in 1842. On

the part of the appellees, it is insisted that this clause includes and disposes of the money in question—or, in other words, that under this clause every thing not specifically disposed of by the testator would pass to his wife and daughter Jane.

As a will is the legal declaration of a party's intentions, which he directs to be performed after his death, it follows, that it is the duty of courts, in the construction of wills, to give full and complete effect to the intention of the testator. In accomplishing this object, rules of construction have been adopted, by which courts are guided in cases of doubt in determining the intention of a testator; these rules are founded in good sense and sound reason, and are admirably adapted to the accomplishment of the great object to be attained in the construction of wills. I shall have occasion to apply some of these rules, in the course of this opinion, to the clause in question.

If the testator intended that the claim he had against the Indians should pass, by the fifth clause, to his wife and daughter, he certainly was unfortunate in the selection of words by which such intention is manifested. The word "property," it is admitted, is a word of large signification, and might include every species of property, whether in possession or action. It might, certainly, be so construed as to include the claim referred to, if such construction is justified by a fair interpretation of the clause in question, and especially, if, by such construction, effect is given to the manifest intention of the testator, to be deduced from a survey of the entire instrument. If, after the several devises contained in the will, he had bequeathed *all his property* to his wife and daughter, we should have experienced but little difficulty in arriving at the intention of the testator. Such a bequest, taken in connection with the introductory clause, would have been deemed and held a residuary clause, although not expressed in the words usually employed in framing such a clause. But was the word "*property*" used in its largest sense in the clause in question? It is to be observed that the words of the clause are, "it is my will that all my property and furniture be in common," &c. The word "property" would include the *furniture*, as well as the *cattle* mentioned in another part of the clause; and the introduction of those words cannot be rejected as unnecessary, if it may be fairly inferred that their use was intended to explain what was meant by the general word "property," with which they are connected. No rule is better es-

tablished than that general words in a will may be restricted in their meaning, or rejected entirely, to carry out the intention of the testator. So general words may be controlled by the particular words which follow. Illustrations of these rules are to be found in reported cases. See 6 Pet. Cond. R. 82, 6, 90; 11 Mass. 528; 10 Paige 187; 2 Atk. 104, 228, 230-1-3-4; 3 Rand. R. 191.

The word "property," then, may be either rejected, or restricted in its meaning, if, by so doing, we do not subvert, but give effect to the intention of the testator. The language of the first part of the clause is as follows: "It is my will that all my property and furniture be in common to my beloved wife, Elizabeth Holiday, and daughter, Jane J. Holiday, so long as they live and keep house together, and when they separate and break up house keeping, then the furniture be divided between them at their discretion; and the stock of cattle delivered up to my beloved wife Elizabeth, to her sole use and behoof." To make this clause sensible, the word "property" should be applied to things capable of being used in common; for it cannot be pretended that it includes real property, that having been disposed of by the previous clauses in the will. To construe the word "property" as including choses in action, would seem a little short of absurdity, as they cannot, from their nature, be used in common. We can readily understand that the wife and unmarried daughter could use in common the furniture, cattle and other personal property of a like nature, but it is difficult to comprehend how a chose in action could be thus used. It would, indeed, have appeared somewhat remarkable, if *money* had been thus disposed of. A person in making a will does not dispose of money by directing it to be used in common among his family, or particular members of that family. If, instead of the claim for over $3,000 against the Indians, he had actually obtained its payment in money, it is apprehended a different mode of disposing of it would have been found in his will. If intended for his wife and daughter, he would either have directed its investment for their benefit, or have given it to them in such proportions as he might deem proper; he certainy would not have given them the *use* of the money, until they separated and ceased to keep house together, and then make no further disposition of it. Admitting, then, that money was included in the word property: all the wife and daughter could claim would be its use until the happening of the event mentioned in the

clause. But it seems to me very clear, from a careful examination of the 5th clause, that it includes nothing but the furniture and cattle; or, at most, such other property of a like nature which he may have owned at the time of his death. It was, indeed, said that the words "*it is my will that all my property and furniture be in common,*" imports an absolute disposition of everything included in the word "property." But this construction would overthrow the latter part of the same clause, which gives the furniture to the wife and daughter, and the cattle to the wife to the exclusion of the daughter, when they "separate and break up house keeping." By giving to the words their natural and ordinary meaning, we make the clause consistent and intelligible; by giving it the forced and unnatural construction contended for, we render nugatory a very important part of the 5th clause.

The will before us was evidently drawn by a person not familiar with the legal import of the words he employed; it bears on its face evidence that it was not prepared by a legal mind. This circumstance will explain the peculiar structure of the 5th clause, embodying, as it does, matters having no connection with each other, and throwing them together in a manner so confused as to render it almost unintelligible. The fact that it was prepared by an unskilful hand, furnishes additional evidence of the intention of the testator. If he intended that the claim against the Indians should pass by the will, he would not have used the word "property," as expressive of such intention. The same may be said of the person by whom the will was drawn. The claim itself would have been specifically mentioned, for the reason that an individual unskilled in the use of technical terms would be likely to adopt words with which he is familiar, and by which his intention could not be misunderstood. If, for instance, the testator intended that the chose in action should pass by his will, he would naturally have expressed his wishes in plain and unambiguous terms; he would have characterized it as a claim or demand against the Indians, and not generally, as "property." So of money which he might wish to dispose of—he would call it *money*, and not "*property.*"

The argument that the preamble or introductory clause shows that the testator intended to dispose of all of his estate, can have no weight, unless the intention thus declared is expressed with reasonable certainty on the face of the will. The introductory clause can only be referred

to in cases of doubtful construction. If, for instance, it appears from the introductory clause that the testator intended to dispose of his whole estate—and the expressions of the residuary clause may, by a reasonable construction, include the whole—they are to be taken in their largest sense, so as to make them harmonize with the introductory part. But in the will before us, there is, in fact, no residuary clause, and the rule above stated has no application.

But it is urged that the concluding part of the 5th clause, and the two subsequent clauses, are conclusive to show that the testator intended to dispose of his entire estate. The testator does not, by the 5th clause, give to his daughter the note against Jameson of $2,000; but to guard against misapprehension, says that he had already given to her the note, and he desired that it might be so understood. Had the note been the subject of a gift by the terms of the will, the fact might have influenced our judgment in giving a different construction to the clause in question. But the most that can be said of the Jameson note is, that it simply furnishes evidence that the testator had made to his daughter a gift of the note, but does not, of itself, confer rights upon her which she did not before possess. It is an assertion by the testator that he desired it to be understood that the note was the property of his daughter. This was undoubtedly done to avoid any controversey that might arise after his death, touching the ownership of the note. This part of the 5th clause may be referred to for the purpose of fortifying the conclusion to which we have come respecting its construction. If the testator was so careful as to refer to a demand against Jameson of $2,000, it is a little remarkable that he should have forgotten to refer specifically to a claim exceeding $3,000, which it is said he had against the Indians. This circumstance, however, may be explained by the fact that claims against the Indians are of so doubtful a character as not to be taken into account by a person in making a final disposition of his estate by will. The testator was fully advised of the manner in which such claims are usually paid. He did not know, and perhaps could not anticipate, that after his death a treaty would be made, by the provisions of which his claim would be allowed. And yet, this was the only mode by which he could reasonably expect to realize anything from it. I have not the slighest idea that this claim entered into his mind when dictating his

will; if it had, I am satisfied a specific provision would have been made with respect to its disposition.

It is further urged, that if the decree of the court below is reversed, William Holiday, the son of the testator, would participate in the distribution of the money realized from this Indian claim, and thus defeat the will of the testator. The will recites, that as the testator had given his son what he thought was sufficient, it was his will that "he have nothing whatever." If the language of the 5th clause was of doubtful construction, the argument founded on this clause of the will would have great weight. But if the view I have taken of that clause be right, the construction contended for by the appellees is inadmissible. By it, no disposition whatever is made of the claim against the Indians; all that can be claimed by that clause is, that the use of the property not previously disposed of by the will should be in common by the wife and daughter until the happening of a certain event; after which, the property particularly specified in the clause is finally disposed of; so that, if any other property was intended, no disposition was made of it.

But a survey of the whole will furnishes another argument against sustaining the decree of the court below. Beside the property given to his wife by the 5th clause, an estate for life is also given in "two lots, messuages, tenements and appurtenances, in the village of Sault Ste. Marie." The last clause declares that what he devised and bequeathed to his wife should be in lieu of dower. To his daughter Jane he gave one-third of his real estate in Illinois, besides what she takes under the 5th clause. He also gave to her, after the decease of his wife, the two lots in the village of Sault Ste Marie. To his daughter Mrs. Holt, and the children of his deceased daughter, who are the appellants in this case, he gave each one-third of his real estate in Illinois. Taking into view the Jameson note of $2,000, it will be perceived that his daughter Jane took a large proportion of the estate. Looking, therefore, to the motives by which the testator was probably influenced in the disposition of his estate, I am unable to see why he should have given to his daughter Jane, besides the real estate and the $2,000 note, so large an interest in the claim against the Indians. That he should have given her more than Mrs. Holt and the children of his deceased daughter, Mrs. Jameson, is not remarkable. As appears by the will, Jane was unmar-

ried; and it was natural enough that such portion of his estate as would be necessary for her support should be given to her. This he has done, and I cannot think that had he supposed the large claim against the Indians would be realized, that he would have excluded his daughter Mrs. Holt and the children of his deceased daughter from a participation of its benefits.

The decree of the judge of probate must be reversed.