J. W. McLAUGHLIN et al. v. THE HOPE MANUFACTURING COMPANY.

*Injunction— Water-Courses; Individual and Public Rights in— The Code, ch. 56, vol. 2.*

1. The classification of water-courses, and the respective rights of individuals and the public therein, as defined in *State* v. *Glen*, 7 Jones, 321, is approved.

2. A stream which has not been used for navigation by boats, but only for rafting timber, turpentine, &c., *down* the stream, comes within the third class, as defined in *State* v. *Glen*.

3. Authority over streams, conferred upon County Commissioners by ch. 56, vol. 2, *The Code*, while it stands and is unimpeached by allegations of fraud or other illegal conduct, is a bar to the remedy by injunction. Therefore, a defendant will not be restrained from erecting a dam across a stream, when he is proceeding under the permit and direction of the Commissioners.

This is an APPEAL from a judgment of *Shepherd, J.*, rendered on the 11th day of December, 1888, dissolving the restraining order theretofore granted, and refusing the motion to continue the injunction, said motion having been heard, by consent, at Rockingham, RICHMOND County.

The facts are stated in the opinion.

*Mr. Thomas H. Sutton*, for the plaintiffs.
*Mr. W. A. Guthrie*, for the defendant.

DAVIS, J.    It is alleged that the defendant is an incorpo-
rated company, engaged in the manufacture of warps, yarns,
plaids, etc., in the county of Cumberland, and that said
company has commenced the erection of a large factory on
the waters of Rockfish Creek, in said county; that the plain-
tiff and other citizens of Cumberland County have, for a
great many years, used the waters of said creek for the pur-
pose of transporting produce, such as rosin, timber, turpen-
tine, etc., to market; that for many years the stream was
"regularly worked by overseers duly appointed to clear the
same of obstructions," and that it was made "a navigable
stream by public enactment of the General Assembly of
North Carolina," and, by long-continued and uninterrupted
use by the public, the public have acquired the privilege
and paramount right to the free and uninterrupted use of
its waters, as a navigable stream, for the transportation of
produce.    It is further alleged, that the defendant company
is erecting a dam across said stream, claiming that it has the
right so to do, upon "the erection of slopes, slips or locks of
the dimensions of 12 x 30 feet," which are totally inadequate
for the purpose of transportation; that the construction of
said dam and locks will obstruct the navigation "of said
waters, and deprive the plaintiff and all other citizens of
their long use and right of navigation of said stream, and
the same, if allowed by the courts, or persisted in by the
defendant, will be a nuisance to the public and people who
have a right to the navigation of said waters, and work
irreparable damage to the plaintiff and all others interested";
that the plaintiff had no notice of the intention of the
defendant to build the dam so as to obstruct the navigation
of said creek until after the same had been commenced, and
made known to the defendant his complaint as soon as he
heard of it.

The plaintiff asks that the defendant be enjoined, etc.

The action was commenced November 20, 1888.

By chapter 197, Acts of 1848–'49, the Courts of Pleas and Quarter Sessions of the counties of Robeson and Cumberland are authorized to appoint overseers, with an allotment of hands, "to clear out and render navigable Big Rockfish Creek, in said counties." By section *three* of this act, it is made unlawful and indictable to obstruct the free navigation of said creek, and section *four* provides that all owners of dams across said stream "shall cause to be constructed, and kept open and in good repair, good and sufficient slopes for the free passage of all rafts of lumber, timber, turpentine and other products."

The plaintiff offered the record of the County Court of Robeson County, January Term, 1845, showing the appointment of overseers of Rockfish Creek, and affidavits tending to show that it was under the charge of overseers in the county of Robeson down to the beginning of the late war; that no work has been done by authority of law since the beginning of the war.

The plaintiff also offered numerous affidavits tending to show that Rockfish Creek has been used by the public for many years—as many as forty, fifty and fifty-five years, within the knowledge of witnesses, and by reputation as many as one hundred years; and some of the affidavits tend to show that the lock erected at the dam of defendant is not sufficiently long to permit the shipment of rosin, tar, etc., without serious loss to shippers.

The defendant company answers, at great length, and sets out the circumstances under which the dam in question was erected.

The defendant filed, as appears from the record, a petition to the Board of Commissioners of Cumberland County, on the first Monday in February, 1888, as follows:

"The petition of the Hope Mills Manufacturing Company respectfully represents that it is desirous of erecting a dam across Big Rockfish Creek, in the county of Cumberland, on

the lands of the petitioner, adjoining the lands of J. W. Emmett and others, for the purpose of erecting the necessary buildings and machinery for a cotton factory.

" That your petitioner is informed and believes that for many years last past said Big Rockfish Creek has not had overseers appointed nor hands assigned to work the same, under the provisions of chapter 56, vol. 2, *The Code* of North Carolina, and said creek has not for a long time been treated as a stream within the provisions of said chapter.

" But as your petitioner proposes to expend large sums of money in the erection of said dam and buildings and machinery, before doing so, and out of abundant caution, your petitioner desires an expression of the sense of your honorable Board, as to the object contemplated, and whether or not the erection of the proposed dam across said Big Rockfish Creek meets with your approval.

" That your petitioner requests, in case the erection of said dam shall meet with your approval, that your body shall appoint a committee, under the provisions of sections 3710, 3712, 3713 and 3714 of ch. 56, vol. 2, *The Code,* aforesaid, clothed with the duty of determining whether any gates or slopes in said dam are necessary, and, if so, the plan, dimensions and construction of the same, to the end that your petitioner may be apprised beforehand as to what will be required, and that all provisions of law in that behalf may be observed by your petitioner, and all controversy relating to the same obviated in the outset."

That the petition of said corporation was granted by the unanimous vote of the Board of Commissioners, and the following resolutions unanimously adopted, viz.:

" *Resolved,* that the erection of a dam across Big Rockfish by the Hope Mills Manufacturing Company, on the lands of said company, adjoining the lands of J. W. Emmett and others, meets with the approval of this Board.

" *Resolved,* that A. B. Williams, Jas. D. McNeill and John Blue be appointed commissioners to ascertain whether or not gates and slopes are necessary in said dam, and, if so, the plan and dimensions of the same, giving hereby to said commissioners all legal authority and power relating to the same provided in chapter 56, vol. 2, of *The Code.*"

It appears that when the petition was filed and acted upon, many people from different parts of the county were in the commissioners' office, and in and about the court-house; that Wm. Aldeman, a resident near Big Rockfish Creek, discussed the subject-matter of the petition, in behalf of turpentine and timber men, who used said stream for rafting, etc., and, at his suggestion, one of the commissioners was appointed by the board, on account of his residence in that part of the county, to represent them. It further appears that the action of the Board of Commissioners was published in the *Fayetteville Observer,* a newspaper of consid-erable circulation, and to which, as appears from the affida-vit of its writer, the plaintiff was a subscriber, and that the commissioners appointed to ascertain what was necessary in regard to gates or slopes, pursuant to previous notice, met at the place where it was proposed to erect the dam, at which meeting persons representing the timber and rosin interest were present, and a plan for the construction of the dam was agreed on by the commissioners appointed by the Board, and reported to the Board of Commissioners at their meet-ing on the 5th of March, 1888, and unanimously adopted, and soon thereafter the defendant company commenced the erection of the dam, in accordance with the plan reported, and had expended a large sum of money; and on the 9th day of October, after the expenditure, as the defendant alleges, of at least $75,000, a petition to the Board of County Commissioners was filed praying " for relief in regard to the obstruction of Rockfish Creek," by defendant's dam.

The Board of Commissioners, against the protest of the defendant, and after hearing both sides, granted the petition, and resolved that "the case be re-opened for the purpose of securing full information in regard to the locks and dams proposed to be put in said stream."

Thereupon, a resolution was adopted, to the effect that the committee again visit "the grounds, after full notice to the citizens interested, of the time, * * * and report to the Board, at its next meeting, what action should be taken in regard to said obstruction."

This committee made a report, in which, after setting forth that, after giving notice, they met at the mill of defendant, and, after stating that "several parties interested in the navigation of Big Rockfish, who were not at the previous meeting, were present this time," and giving the contention of each side, they concluded as follows:

"At the first meeting of your committee, to take action upon the application to dam the stream, the present size, 12 x 30 feet, was unanimously agreed upon by all present, and we, therefore, having made that report to you, and it having been acted upon and accepted, do not feel that we have any right or power to make any change, and, therefore, ask to be discharged from any further service in this matter."

The evidence, in the shape of affidavits, is voluminous, and the plaintiff, by affidavit, alleges that the delay in bringing action was, in substance, because of the frequent and repeated promise of the defendant company, by its agent, "that they would endeavor to make the required changes," and, relying on these assurances, and believing that there would be a satisfactory adjustment, suit was delayed, and only resorted to when all other means had failed.

In *State* v. *Glen*, 7 Jones, 321, BATTLE, Judge, after a very full review of the authorities upon the subject, gives the following as a summary of the law of North Carolina in relation to the water-courses of the State:

" 1. All the bays and inlets on our coast, where the tide from the sea ebbs and flows, and all other waters, whether sounds, rivers or creeks, which can be navigated by sea vessels, are called navigable, in a technical sense, are altogether *publici juris*, and the soil under them cannot be entered and a grant taken for it, under the entry law. In them, too, the right of fishing is free. See *Collins* v. *Benbury*, and the other cases to which we have referrred on this point.

" When the tide ebbs and flows the shore between the high and low water is also within the prohibition of private appropriation, under the general entry law, but may be the subject of a direct special legislative grant. *Ward* v. *Willis*, 6 Jones' Rep., 183.

" 2. All the rivers, creeks and other water-courses, not embraced in the above description, but which are in fact sufficiently wide and deep to be navigable by boats, flats and rafts, are technically styled navigable, and are open to be appropriated by individuals, by grants from the State, under the entry laws. When the bed of the water-course is not included in the grant, but the stream is called for as one of the boundaries, the grantee is entitled, as an incidental easement, to go to the middle of the stream, and may exercise and enjoy that easement for the purpose of catching fish, or in any other manner not incompatible with the right which the public have·in the stream for water communication between different points on it. The mode and the extent of the enjoyment of this easement may be regulated by statute, and as the riparian proprietors paid nothing into the public treasury for it, the soil which composes the bed of the river may be granted to others, and the Legislature may, perhaps, reserve the incidental rights for the public use, without making compensation for them, though we believe it has often given such compensation. See *Smith* v. *Ingram*, 7 Ired., 175, and the various charters granted to companies for improving the navigation of nearly all our largest rivers.

"3.  All the rivulets, brooks and other streams, which, from any cause, cannot be used for intercommunication, by inland navigation, are entirely the subjects of private ownership, are generally included in the grants of the soil, and the owners may make what use of them they think proper, whether it be for fishing, milling or for other lawful trade or business.  The only restriction upon this right of ownership arises, *ex necessitate,* from the nature of running water, and it is that the owner shall so use the water as not to interfere with the similar rights of other proprietors above or below him on the same stream.  See *Pugh* v. *Wheeler*, 2 D. &. B., 50.

"Rights acquired in streams of this class by grants from the State, or in water-courses of the second class, by grants from the State for the bed of the stream, cannot be taken from the owners by the government, except in the exercise of the power of *eminent domain*, and then only for public use, with a provision for the just compensation.  See *Raleigh and Gaston Railroad Company* v. *Davis*, 2 D. & B., 451."

Rockfish Creek has not been used for navigation by boats, but only for rafting timber, turpentine, etc., *down* the stream, and it would seem to come within the third class of Judge Battle's summary.  But it is insisted by the plaintiff that, however this may be, by long and uninterrupted use, and by legislative enactment, the public has become entitled to its use as a highway for the transportation to market of their timber, turpentine and other products, and it is denied that the County Commissioners can authorize its obstruction.

What is a good and sufficient passway for rafts must be a question for the determination of some authority, and in the case of Rockfish Creek, prior to the adoption of the present system, this authority, under the supervision of the county courts of Cumberland and Robeson counties, was vested in overseers, whose duties were to remove all obstruc-

-tions, and see that those who erected dams for mills provided good and sufficient slopes.

The authority over all such streams is now vested in the Board of County Commissioners of the several counties through which the streams may flow, to be exercised in the manner prescribed by chapter 56 of *The Code*, and the defendant company applied for, and, it appears, erected its dam under the authority conferred by that chapter.

What action was taken by the Board of Commissioners upon the last report of the committee does not appear, and whether they had the power, after the defendant had expended money in the erection of the dam and lock, under the authority conferred, to revoke the authority and require the defendant to change the passage way for rafts or remove its dam without compensation, is not a question for our consideration. The authority of the Board of County Commissioners, while it stands, and is unimpeached by allegations of fraud or other illegal conduct, is a bar to the remedy sought by the plaintiff in this action.

No special damage is alleged, and whether, if the dam be " a nuisance to the public," the action could be maintained by the plaintiff, as insisted by his counsel and denied by the defendant, it is not necessary for us to determine. There is no analogy between this case and that of the *State* v. *Narrows Island Club*, 100 N. C., 477.

The subject is fully discussed by Wood in " Law of Nuisances," in the chapter on Navigable Streams, section 575, *et seq*. He concludes that in this country there are three classes of navigable streams :

1. Tidal streams that are navigable in law.

2. Those that, although non-tidal, are yet navigable *in fact* for " boats or lighters," and susceptible of valuable use for commercial purposes.

3. Those which are *floatable*, or capable of valuable use in bearing the products of the mines, forest and tillage of the country it traverses to mills or markets.

The ex'ent to which the riparian owner may go in the erection of dams, etc., to apply the use of the water to the propulsion of machinery, and the extent to which the State may authorize obstructions, present interesting questions, the consideration of which is not necessary for the determination of the case before us.

No error.                                    Affirmed.