JESSE A. GWALTNEY v. THE SCOTTISH CAROLINA TIMBER AND LAND COMPANY.

*Action for Damages—Floatable Streams—Practice—Evidence— Floating Logs—Navigable River—Riparian Rights.*

1. When, upon any aspect of his case, viewed in the most favorable light for him, the plaintiff is entitled to recover, the issues should be submitted to the jury.

2. In an action for damages to a dam, shown to have been done by defendant's floating logs in an unnavigable river, there was conflicting evidence as to whether it was a floatable stream: *Held*, that the burden of showing its character as such was on the defendant.

3. A river, the character of which was not definitely or unquestionably shown, in which logs are not shown to have been floated in the parts in controversy until recently, and then only by the defendant, though they had been usually floated in other parts of the river above the parts used by the defendant, is not shown to be a floatable stream.

4. *Quæry*, as to whether in floatable streams the right to float logs should not be exercised with reference to the rights of riparian proprietors.

MacRae and Burwell, JJ., concurring.
Clark and Avery, JJ., dissenting.

This was a CIVIL ACTION, tried at the December Term, 1890, of Buncombe Superior Court, before *Philips, J.*

At the close of plaintiff's evidence, the character of which may be gathered from the opinions and dissenting opinion, the Court intimated that, assuming the facts as testified to be

GWALTNEY v. TIMBER AND LAND CO.

true, the plaintiff could not recover, and that he would so instruct the jury. Whereupon, the plaintiff submitted to nonsuit and appealed.

Below will be found the complaint and answer—

1. That on or about the 12th day of January, 1888, the plaintiff was, and still is, the owner and in the possession of a tract of land lying in the county of Buncombe, State of North Carolina, on the east side of French Broad river, at the mouth of a small branch called Davis branch, about two miles south of Alexander, in said county.

2. That plaintiff had, several years prior to the 12th day of January, 1888, erected out of stone and wood, at a cost of thirteen hundred dollars ($1,300), a dam and fishery, extending along the said river opposite the plaintiff's land (plaintiff's land extending to and being along the banks of the river), for the purpose of trapping fish from said river.

3. That the plaintiff caught yearly in the said fishery large quantities of fish, sufficient to supply his family and the men employed on his farm, and also enabling him to sell large quantities of fish; that the value of the fish consumed by his family and his employees was five hundred dollars ($500) yearly, and the sale of fish brought him a yearly revenue of five hundred dollars ($500).

4. That the said French Broad river, at the point at which said dam and fishery are situated, is not a navigable stream, and that the said dam erected by the plaintiff did not extend entirely across the river, but only about two-thirds ($\frac{2}{3}$) across, and that one-third ($\frac{1}{3}$) of the river was open for the use of the public, and made a suitable passage-way for logs, or other things floating or rafted down said river, and for the free passage up and down said stream for fish.

5. That commencing in the month of October, 1887 (and from that time until now), the defendant undertook to float down the said river from the counties of Henderson and Transylvania large quantities of poplar logs from twelve (12)

to twenty (20) inches in diameter, and from twelve (12) to sixteen (16) feet in length, and on the said 12th day of January, 1888, was engaged in the business of floating the said logs down the said river.

6. That the defendant, on the said 12th day of January, 1888, took so little and such bad care in the direction and management of the floating of said logs, that large quantities of said logs, to-wit, the number of one hundred and fifty (150), by and through its carelessness, negligence and mismanagement, gathered and lodged in plaintiff's said dam and fishery, and utterly demolished and destroyed both the said dam and the said fishery.

7. That by reason of the utter destruction of said dam and fishery, the said plaintiff has been damaged to the amount of thirteen hundred dollars ($1,300), the amount actually expended by him in the erection of said dam and fishery, and has also been deprived of the revenue derived from the consumption and sale of fish caught from the said fishery, to his damage fifteen hundred and eighty-three dollars and thirty-three cents ($1,583.33).

8 The plaintiff is pecuniarily unable to rebuild said dam and fishery, and will be deprived of the use of the same for a long time, to his damage one thousand dollars ($1,000).

Wherefore, the plaintiff demands judgment against the defendant—

1. For the sum of thirty-eight hundred and eighty-three and 33–100 dollars ($3,883.33).

2. For the costs of this action.

And for a second cause of action, the plaintiff says—

1. That at the time stated in the first cause of action, the plaintiff was lawfully possessed of a certain fishery in the French Broad river at the point described in the said first cause of action and constructed and maintained as therein mentioned of great value, to-wit, five thousand dollars ($5,000).

2. That being so lawfully possessed, and in the enjoyment of said fishery, on the 12th day of January, 1888, the defendant wrongfully and negligently suffered and permitted certain logs, which they were engaged in floating and rafting down said river, to be driven against and upon plaintiff's said dam and fishery, whereby the same was totally destroyed, to his great damage, to-wit, in the sum of thirty-eight hundred and eighty-three and 33–100 dollars ($3,883.33).

Wherefore, the plaintiff demands judgment against the defendant—

1. For the sum of thirty-eight hundred and eighty-three and 33–100 dollars ($3,388.33).

2. For the costs of this action.

And the said defendant, answering complaint of the plaintiff, heretofore filed herein, says—

1. That the allegations of the first paragraph of the amended complaint are untrue.

2. That the allegations of the second paragraph of the amended complaint are untrue.

3. That the allegations of the third paragraph of the amended complaint are untrue.

4. That the allegations of the fourth paragraph of the amended complaint are untrue.

5. That the allegations of the fifth paragraph of the amended complaint are untrue.

6. That the allegations of the sixth paragraph of the amended complaint are untrue.

7. That the allegations of the seventh paragraph of the amended complaint are untrue.

8. That the allegations of the eighth paragraph of the amended complaint are untrue.

And the defendant, answering the second cause of action alleged in the said amended complaint, says—

1. That the allegations contained in paragraph one of the said second cause of action are not true.

GWALTNEY *v.* TIMBER AND LAND CO.

2. That the allegations contained in paragraph two of the said second cause of action are not true.

For further defence, the defendant alleges—

1. That the said French Broad river is such a stream as is capable of being used for floating rafts, boats and logs, and is, in this sense, a navigable stream, and subject to the puble use as a public highway and easement, and, as such public highway and easement, has been, for a long time prior to the 1st day of October, 1887, and before the plaintiff erected said dam, if he erected it at all, so used by all persons desiring to float logs and rafts and boats thereon.

Wherefore, the defendant demands judgment against the plaintiff herein for its costs.

*Messrs. Theo. F. Davidson* and *Thomas A. Jones*, for plaintiff. *Mr. Charles A. Moore*, for defendant.

SHEPHERD, C. J.: At the close of the testimony, his Honor intimated an opinion " that, assuming the facts testified to be true, the plaintiff was not entitled to recover," and thereupon the plaintiff submitted to nonsuit and appealed. The question in issue was whether the French Broad river, from Asheville down to the plaintiff's dam, was a floatable stream. There was testimony relating to the character of the river *above* Asheville, and also variant if not conflicting testimony as to its floatable capacity below that city. It would be difficult, therefore, to ascertain upon what facts his Honor based his ruling, unless we consider that he meant that in *no aspect* of the testimony could the plaintiff maintain his action. This, of course, is the view which we must take, and it is our duty to base our judgment upon that testimony which is most favorable to the plaintiff. We are not permitted to attempt a reconciliation of the testimony so as to make out a case for the defendant, but we should examine it with the opposite view of ascertaining whether there is *any* evidence which

tends to sustain the plaintiff's action. Gould on Pleading, ch. 9, sec. 65; *Knight* v. *Railroad*, decided at this term; *Bond* v. *Wool*, 107 N. C., 146.

Now the plaintiff's dam, having been injured by the logs of the defendant, as stated by the witnesses, it was incumbent on the latter to show that the river was a floatable stream at the point where the injury was inflicted, and, if it has failed to do this, the plaintiff was entitled to recover. It is said that "it is not necessary, in order to establish the easement in a river, to show that it is suceptible of use continuously during the whole year for the purpose of floatage; but it is sufficient if it appear that business men may calculate that, with tolerable regularity as to the season, the water will rise to and remain at such a height as will enable them to make it profitable to use it as a highway for transporting logs to market or mills lower down." Accepting this as a correct proposition of law, we are unable to see how the defendant has brought itself within its terms. It appears from the testimony of R. B. Justice that the water "above Asheville is stiller and deeper," and while it is stated by the witness Wilkerson that the river has been used for floating logs for fifteen or twenty years, he expressly testifies, upon further examination, that the statement was made in reference to the river above Asheville.

It is apparent from the testimony of the witness Wilkerson that all of his floating was done above Asheville, and it does not show that there has been any floating of logs below that place except what has been done by the defendant, and as to this he does not state how long the defendant has been so using the river, or its condition when the floating was done. It is perfectly consistent, therefore, with the testimony of the witness Zachary, who says that he and his brother, between the first of December, 1887, and the first of May, 1888, put logs in the river for the defendant, to go to its mill in Knoxville, Tenn. The witness Garret testifies that prior to the

organization of the defendant no logs were floated down the river from Asheville. So, taking all of the testimony, we have nothing which expressly shows that the river below Asheville was ever used by anyone for floating logs except during the six months mentioned by Zachary, and, for aught that appears, the floating may have been done in time of extraordinary freshets. Neither is there any definite testimony as to the character of the river below Asheville, as it is by no means certain whether Zachary's testimony on this subject does not refer to some point above that place, where he seems to have resided, and where he worked, as testified, for the defendant. When we add that it is stated by one of the witnesses that the river " *is not capable of floating logs unless there is a freshet,*" it would seem that the defendant has failed to bring itself within the principles above mentioned. How can it be said, upon such testimony, that " business men may calculate that, with tolerable regularity as to the season," the water below Asheville can be profitably used for the floatage of logs? An ingenious advocate might possibly induce a jury to come to such a conclusion, but it is very certain that this Court has no right to do so; and especially is this true when we consider that it is our duty, not to determine whether there is any evidence to sustain the defence, but whether there is *any possible view* of the testimony upon which the plaintiff may recover. As we have indicated, it must be assumed that the plaintiff has suffered injury at the hands of the defendant, and, the river not being a navigable stream, it is incumbent upon the defendant to establish that it is floatable within the legal meaning of that term. This being so, we cannot see how the case could have been taken from the jury. It is true that the plaintiff cannot contradict his own witnesses, but as we have seen that, taking all that they testify to be true, it is doubtful whether it makes out a case for the defendant, and it is very certain that, if we take the view most favorable to the plaintiff, he is entitled to

recover. There being some testimony tending to sustain the action, we think that we should simply grant a new trial without attempting to pass upon the very important questions discussed by counsel.

Conceding that this is a floatable stream (and we think there is testimony tending to show that it is), another serious question to be determined is whether the right to float logs must not be exercised with reference to the rights of riparian proprietors. To sustain the nonsuit in this case would, we fear, be construed as an indication that the right of floatage is paramount to all other interests, and we are not prepared to assent to such a proposition. However this may be, we think the facts should either be ascertained, or that there should be instructions clearly presenting the questions to be determined. Until this is done, we should refuse to decide questions involving such grave consequences to a large number of citizens owning property on the said river.

Error.

BURWELL, J.: I concur in the opinion of the Chief Justice.

MacRae, J., concurring: His Honor held that, assuming the truth of the facts testified to, the plaintiff was not entitled to recover; whereupon, the plaintiff submitted to a nonsuit and appealed. This makes it necessary for us to consider the evidence in the most favorable light to the plaintiff, and determine whether he had entirely failed to make out his case, or was there sufficient evidence to have been submitted to the jury upon proper issues before the judgment of the Court could be pronounced. No issues seem to have been framed, but several interesting questions must have been presented to the jury, if, in the opinion of the presiding Judge, the evidence had called for their consideration. Upon the main issue, whether the plaintiff's dam and fishery had been destroyed by the negligence of defendant, as alleged in

the complaint, there arose questions which might have been framed into other issues, or comprehended in that which has been indicated as the principal one arising upon the pleadings.

After having ascertained from the evidence whether the plaintiff, as he alleged, was the owner of land upon the banks of the French Broad River, and in the possession of valuable erections in the stream used by him as a fishery, it would have been necessary for the jury to have ascertained the character of the stream—whether the same is such a stream as is capable of being used for floating rafts, boats and logs, and is in this sense a navigable stream and subject to the public use as a public highway and easement, as alleged in the answer. It is purely a question of fact dependent upon the capacity of the stream, the products of the country, and the profitableness or unprofitableness of its use in that manner. Wood on Nuisance, sec. 464, 2d ed.

The leading case on the subject of the law of watercourses in North Carolina is *State v. Glenn*, 7 Jones, 321, in which the late Judge BATTLE, in a very able opinion, discussed the rights of the public, and of the riparian owners, and of the owners of the beds of these streams. He divides them into three classes—

"1. All bays and inlets on the coast where the tide ebbs and flows, and all other waters which can be navigated by sea-vessels, are navigable waters, *publici juris*—not confining them to the criterion of ebb and flow which obtains in England.

"2. All the rivers, creeks and other watercourses not embraced in the above description, but which are in fact sufficiently wide and deep to be navigable by boats, flats and rafts, are technically styled unnavigable, and are open to be appropriated by individuals by grants from the State under the entry laws. When the bed of the watercourse is not included in the grant, but the stream is called for as one

of the boundaries, the grantee is entitled, as an incidental easement, to go to the middle of the stream, and may exercise and enjoy that easement for the purpose of catching fish, or in any other manner not incompatible with the right which the public have in the stream for water communication between different points on it."

In the third class he places all the rivulets, brooks and other streams which from any cause cannot be used for intercommunication by inland navigation, and these, he says, are entirely the subjects of private ownership.

While it will be noticed that the second class is by his definition confined to such as are sufficiently wide and deep to be navigable by "boats, flats and rafts," no mention is made of logs. The timber interests had not then assumed the proportions which they have at this day in North Carolina, but it is interesting to note that during the same year, and some months before the opinion was delivered, the General Assembly had passed an act amending chapter 100 of the Revised Code, concerning rivers and creeks, and giving the Commissioners power to "lay off gates, with slopes attached thereto, upon any mill-dam built across such stream, of such dimensions and construction as shall be sufficient for the convenient passage of floating logs and other timber, in cases where it may be deemed necessary," &c. Thus it will be seen that the Legislature at that time recognized the necessity of keeping open the streams for the passage of timber, then as now an important article of commerce, and it may well be that logs would have been included in the list with boats, flats and rafts, if the attention of the learned Judge had been called to it. It will not be necessary to cite the many cases in our Court, before and since that to which I have specially referred. But in the case of *McLaughlin* v. *Manufacturing Co.*, 103 N. C., 100, for the first time I see an allusion to another class of streams called floatable—a term now in general use, especially in

those States where there are great timber interests, as in the Northeastern States and upon the Great Lakes.

Floatable streams are said to be " capable of valuable use in bearing the products of mines, forest and tillage of the country it traverses to mills and markets."

I am inclined to admit (and I suppose his Honor was of this opinion) that from the testimony in this case it was proved that the French Broad river, at the point of inquiry and above and below, is a floatable stream, but if from this assumption he was led to the conclusion that therefore the defendant might place his timber in the river to be carried by the rising waters without a guide or driver, and without regard to the safety of the property of riparian owners and their erections in and upon the stream, and if for this reason he intimated his opinion that upon his own evidence the plaintiff was not entitled to recover, I have grave doubts as to the correctness of the conclusion.   Clearly, under our authority, from the earliest case cited in *State* v. *Glenn* to *McLaughlin* v. *Manufacturing Co.*, it is held that the owners of the adjacent lands had the right to use the water to the thread of the stream in the watercourses styled technically unnavigable, even where the bed of the stream had not been granted, so as not to obstruct the public or its right of floatage.

The authorities upon the subject of watercourses and the rights of navigators and riparian proprietors are abundant, and ever increasing in number in many of the States and in Canada, and it would serve no good purpose to quote more than is sufficient to give weight to our proposition.

In the case of *Gaston* v. *Mace*, 33 W. Va., 14, navigable streams are divided into (1) tidal streams; (2) those non-tidal, but navigable for boats or lighters, and (3) floatable, to which last class are given the definition we have quoted, *supra*, and in relation thereto a quotation is used from *Lancy* v. *Clifford*, 54 Me., 487.

"A stream, which, in its natural condition, is capable of being used for floating logs, lumber and rafts, is subject to the public use as a highway, though it be private property and not strictly navigable. This right of the public, however, must be exercised in a reasonable manner. * * * The various purposes for which such a highway is used by the public, whether for transporting merchandise, rafting, driving or booming logs, or securing them at the mill afterwards, if necessary, require so much space as temporarily to obstruct the way, but if parties so conduct themselves in this business as to discommode others as little as is reasonably practicable, the law holds them harmless." Speaking of the conflict of interests between the navigators and the riparian owners, "the common law * * * furnishes a solution of this difficulty by allowing the owner of the soil, over which a floatable stream which is not technically navigable passes, to build a dam across it and erect a mill thereon, provided he furnishes a convenient and suitable sluice or passage-way for the public by or through his erection. In this way both these rights may be exercised without substantial prejudice or inconvenience."

I might well adopt this language in regard to the rights of _floaters_ upon streams of the character indicated, where the bed of the stream has not been granted, and where the riparian owners have the right to use the waters to the thread of the stream.

I may take a passage from section 110 of Gould on Waters: "The rights of the public are not superior to private rights in streams which are merely floatable, to the same extent as in rivers which are capable of more extended navigation. * * * But the right of floatage is not exclusive of the use of the water for machinery, and the rights of the public and those of the riparian owners are both to be enjoyed with a proper regard to the existence and preservation of the other.

"If dams are so constructed as to limit the public passage

to a small portion of the stream, and sufficient provision is made for the passage of logs, the public cannot complain, while those who exercise the right of floatage are liable to the riparian owners for such exercise of the common right as causes them an injury."

We conclude that the plaintiff was at any rate entitled to have the jury pass upon the question whether he was damaged by the negligent manner in which the logs were driven down the stream, under proper instructions.

In the case of *Lewis* v. *Keeling*, 1 Jones, 299, where, in Chowan river, a navigable stream, the steamer ran over the seine and injured it, the right of navigation was undoubtedly paramount to that of fishing; it was clearly intimated that while the steamer had the right to run over the seine in the *bona fide* prosecution of its business, it could not do so wantonly or unnecessarily. The brief the late Judge Barnes in this case has abundant authority to show that if the defendant negligently destroyed plaintiff's property, even if it were a nuisance, he is liable for its value. And this might apply to our present case, even though it were clear that plaintiff's erection over-passed the thread of the stream.

If the intimation of his Honor and consequent nonsuit of the plaintiff would have the effect to declare that the river in question is what is now called a floatable stream, the principle involved might affect many rivers in North Carolina with varied riparian rights and valuable interests. Great care should be exercised in the settlement of the law in North Carolina between important and sometimes conflicting interests. The decisions in other States on kindred subjects, in many cases, depend upon local usage or special legislation. We must look, in a great measure, to our own statutes and to the common law as interpreted by our own Court.

I desire to make no intimation with regard to streams where the bed has been granted by the State. As far as the evidence in this case shows, the lands of the plaintiff and

of those through whom he derives title out of the State, are bounded by the river, giving them, as I have said, the right to the use of the stream to its thread.

Without pursuing our inquiries further, it seems to me that his Honor ought to have permitted the case to go to the jury with instructions as to the law bearing upon suitable issues.

CLARK, J., dissenting.

AVERY, J., dissenting: While the criterion by which the navigability of waters was determined in England has not been adopted as a test in America, the rule established in both countries is founded upon the same substantial reason, that where a particular watercourse can be relied upon with tolerable regularity as a highway for transporting valuable products of an extensive section of country to market, those who are engaged in conducting such commerce have an easement superior to the right of the owner of the soil or the riparian proprietor. *Thunder Bay Co.* v. *Speechly*, 31 Mich., 336; *Moore* v. *Sanborn*, 2 Mich., 519 (59 Am. Dec., p. 20); *Walker* v. *Allen*, 72 Ala., 456; *Little Rock, etc., Railroad Co.* v. *Brooks*, 39 Ark., 403; The Montello, 20 Wall., 441; *Broadnax* v. *Baker*, 94 N. C., 681; *Brown* v. *Chadbourn*, 31 Me., 9; 6 Lawson's R. & Rem., sec. 2928; Wood on Nuisances, sec. 588; *Davis* v. *Winslow*, 51 Me., 264 and note 81 Am., sec. 582; Angell on Highways, sec. 55; Angell on Watercourses, sec. 537; The Daniel Ball, 10 Wall., 563; *Hikok* v. *Hine*, 13 Am. Rep., 255; *State* v. *Narrows Island Club*, 100 N. C., 477.

In England the streams above tide-water were seldom, if ever, made to subserve such useful purposes; but in many portions of America there are rivers that afford an outlet (and freqently the only one) for most valuable ores and timber. It has been well said, that " in the most approved modern sense of the term in this country, navigable waters include

all those which afford a channel for useful commerce. Such waters are public highways of common right." 16 Am. and Eng. Enc., p. 236.

This Court distinctly recognized the principle that the right of a riparian proprietor of both banks was servient to the easement of the public in the water for the purpose of carrying to market whatever of the products of the country could be transported upon it in *State* v. *Glenn*, 7 Jones, 321; using the language afterwards quoted in *State* v. *Narrows Island Club*, *supra*. " As the riparian proprietor of the land on both sides of the stream, he is clearly entitled to the soil entirely across the river, *subject to an easement to the public for the purpose of transportation of lime, flour and other articles in flats and canoes.*" It was in evidence in that case, that flat-boats could be used and had been employed in carrying the articles mentioned on the Yadkin river. It was in evidence, and not disputed, that the French Broad river had been used for transporting logs for fifteen or twenty years, as high up as twenty-six or twenty-eight miles above the plaintiff's fish-traps; that it was probably susceptible to such use to a point further up the main stream, and that within the section actually used three tributaries, Swannanoa, Little river and Mud creek, emptied into it. Without considering the additional faciliti·s that may have been afforded by the smaller streams for bringing timber to the French Broad, we must conclude that its use as an artery of commerce, though confined to the transportation of logs, will not only prove valuable to those engaged in manufacturing lumber, but will furnish a channel by which the timber in a large area of territory extending out from both banks of the river may find an outlet to market. As none but the most valuable hardwood logs will bear transportation by railway from points remote from the coast, as a rule the value of immense forests is often left to depend upon local demand until the cheaper water highways are utilized. Hence, public policy, as well

111—36

as reason, upon which the recognition of the easement in watercourses is founded, have inclined the Courts to sustain the right of the owners of large forests or extensive mining districts to enjoy the privilege, when shown to be very valuable to them, at the comparatively insignificant sacrifice on the part of a riparian proprietor of using his property in subordination to it. It was upon such consideration that the Courts of those States where the fresh-water streams were first found useful in the development of mineral or well timbered lands, declared that the reason of the English rule extended, under the widely different circumstances often existing in this country, not only to navigable tidal streams and fresh-water streams large enough for boats and lighters, but to such as subserved the purpose of bearing the products of the mines, forests and tillage of the country traversed by them to mills or market. Wood L. Nuis., sec 586; 16 Am. and Eng. Enc., 242; *Moore* v. *Sanborn*, 2 Mich., 526; *Brown* v. *Chadbourne, supra; Lewis* v. *Coffee*, 77 Ala., 190; *Treat* v. *Lord*, 42 Me., 552; *Canfield* v. *Erie*, 1 Mich., 105; *Grand Rapids* v. *Jarvis*, 30 Mich., 308; *McLaughlin* v. *Mining Co.*, 103 N. C., 100; *State* v. *White Oak River Corporation*, at this term.

The best criterion of the navigability of a watercourse, therefore, is unquestionably its adaptability for the purposes of useful commerce, and, bearing this controlling principle in mind, we see no sufficient reason for the arbitrary distinction which counsel contended should be drawn between transporting logs in rafts and allowing each log to drift or float with the current of the stream. The object being to develop vast forests of virgin trees, that are located remote from the centers of trade, by utilizing the natural force of the flowing water as a means of cheap transportation, the reasons offered for sustaining the right to the easement, in a sluggish stream, where the logs can be floated in rafts, and denying its existence in a watercourse of much greater volume

and equal depth, because it is studded with immense rocks, and the fall is so great and the current so strong that rafts cannot be handled with safety, seem to me very unsatisfactory. The recognition of the distinction would prohibit the development of the mountain section, where there are generally strong currents and sudden falls, though Nature had furnished the means of reaching the object in view. more certainly and expeditiously by using the swift rather than the sluggish current. If logs were attached to each other so as to form large rafts, they might be so steered as to avoid nets, dams and other obstructions placed in water that moves slowly; but, even though no large stones protruded above the surface of a swift stream, it would be impossible without the aid of a steam tug to protect dams built across them from the consequences of collision, involving much more danger of destroying them than would the lodging of logs, one at a time, against them. In this view we are sustained by abundant authority in those States where the floating of logs to market has become an extensive and profitable industry. *Brown* v. *Chadbourne, supra ; Field* v. *Log Co.,* 67 Wis., 569; *Buchanan* v. *Grand River Co.,* 48 Mich., 364; *Muse* v. *Smith,* 3 Oregon, 621; *Grand Rapids* v. *Jarvis, supra; Treat* v. *Lord, supra.*

It is true, that in one or two of the States where the forests are not extensive or the timber trees very valuable, the rule has been adopted that a due regard for the rights of owners of dams requires that the logs should either be transported in rafts in charge of some persons who can steer them, or that during the season when they are being floated men should be posted at intervals along the banks of streams to prevent a collection of logs at any one point. But in States where timber has become an important article of commerce, the better rule prevails that when we even concede a stream to . be a public highway, all private rights in it

must be as completely subordinated as in a public road passing through land of private individuals.

The Legislature unquestionably has, on the one hand, the power to make any obstruction of a highway indictable, or, on the other, to permit the original owner of the land in the exercise of his servient right to erect a gate across the highway upon certain conditions which will protect the public from great inconvenience in using it. In the same way the Legislature has, by statute (*The Code*, § 1849) provided that the owner of land on one bank of a stream may, under certain circumstances, cause a mill-site to be condemned. On the other hand, *The Code*, § 3706 *et seq.*, clearly recognizes the doctrine that all streams that are susceptible of use for commerce, are public highways which may be taken in charge by the County Commissioners and cleared out and improved at the expense of the county, and placed in charge of overseers with certain designated hands subject to their orders, just as is done in reference to public roads. And the Legislature has, in the most explicit terms, recognized also the principle that streams susceptible of use for floating logs are public highways in which the public have a right superior to even that of the mill-owner, who has the fee-simple in the whole bed of the stream. In section 3712 of *The Code*, commissioners, who may be appointed by the county authorities "to examine and lay off rivers and creeks in their county" (section 3710), are empowered "to lay off gates with slopes attached thereto, upon any mill-dam built upon such stream, of such dimensions and construction as shall be sufficient for the convenient passage of floating logs and other timber."

If the riparian proprietor or owner of the bed of the stream had a right superior to that of the public, it would be necessary before requiring him to open a passway in his dam to condemn and pay for such way under the right of eminent domain. But it is because all streams

useful for commerce are natural highways, over which the sovereign State is at liberty to assert the right of control for public use absolutely or only to a limited extent, as it may elect, that the owner cannot object t) having it declared subject to public use without condemnation and compensation. *Barnard* v. *Hinkley*, 10 Mich., 459; 16 Am. and Eng. Enc., page 263, note 3.

The statute provides for laying off a way for the convenient passage of *floating logs*, not rafts, thus showing the legislative intent to protect as fully the right of a man who has but a single log, to mark it and let it float along a highway in this State to the waters of the Tennessee, as that of a company that has capital to buy immense forests, construct rafts, and to so enlarge their business as to justify them in posting a line of sentinels to watch and steer from Asheville to Paint Rock. If the public has an easement or right in a river as a highway, it is the office of the Legislature to restrict the use of it so as to protect mills, fish-dams and bridges, if they think best. The Courts have no authority by their judgments to remedy evils for which it is within the province of the law-making power alone to furnish the means of redress. Much less has the Court a right arbitrarily to declare that though a stream useful for commerce is by common law a public highway, it can be used only by persons who fasten logs together and float them as rafts. It seems to me that a Court might as well declare that one who drives an ox or pair of oxen shall not have the right to use the public road, because the ox is less manageable and more apt to bring a conveyance into collision with other passing vehicles than horses or mules. I am free to concede that there has been some conflict of authority on this subject, and, as we are at liberty now to align this Court with those maintaining either view, it is well for us to remember that there are sixteen mountain counties lying west of the Blue Ridge in North Carolina, in all of which will be found timber of great value

that can never find its way to market except by the swift mountain streams, that are for the most part utterly incapable of floating rafts, but many of which will transport logs by the thousands and ultimately deliver them at the market towns, where various railroads cross the Tennessee river. Nature has provided this outlet where the character of the country is such that railways can be built only at immense cost. The Legislature has already defined the respective rights of mill-owners and log floaters, where the timber interest assumes such magnitude in the low country as to challenge the attention of the County Commissioners

It may not be amiss to call attention to the fact that the Legislature has also asserted its right to have all fish-dams on the French Broad river from Paint Rock to Brevard opened for the free passage of fish. *The Code*, § 3410, provides that no person shall place or allow to remain in the French Broad river, from the State line to Brevard, any dam for mill or factory purposes, unless the owner thereof shall construct thereon, at his own expense, a sluice-way for the free passage of fish, of a width of not less than three feet nor more than ten feet. It may be well to remember that the Legislature has thus declared a passway of not more than ten feet sufficient for all purposes between Asheville and Brevard, where the river is admitted to be a floatable stream, and yet a raft must ordinarily be much wider.

In section 3412 it is provided that no other obstruction to the passage of fish shall exist or be built between the designated points in the streams hereinbefore mentioned, unless an opening of not less than twenty-five feet and not more than seventy-five feet, embracing *the main channel* of said streams, shall be made by the owner of such obstructions within twenty days after notice from the Board of Agriculture to make such opening, under penalty of fifty dollars per day for each day such obstruction shall remain unopened.

I think that the statute giving the County Commissioners: the power to take charge of floatable streams is, and was. intended, to be merely in affirmance of the common law right to use a stream capable of floating logs to market with reasonable regularity for a portion of each year, and a grant of authority to the counties for the public benefit to keep such streams unobstructed, just as a public road is kept in good condition. Since it was intimated in Glenn's case, and has since been distinctly declared, that there is such a thing as a stream navigable for logs, it is too late to attempt to distinguish between the dominant right of the public for that purpose and the superior. right of a steamer to the channel of a stream large enough to permit its passage.· *McLaughlin* v. *Mining Co., supra; State* v. *White Oak River Corporation,* decided at this term. A statute, which attempts to confer on mill-owners the right to obstruct the passage of fish is unconstitutional. He maintains his obstruction subject to the right of the Legislature to require, in the interest of other riparian owners, that a sufficient passway for fish be opened in it. 8 Am. and Eng. Enc., p. 35.

It is not necessary, in order to establish the easement in a river, to show that it is susceptible of use continuously during the whole year for the purpose of floatage, but it is sufficient if it appear that business men may calculate that, with tolerable regularity as to the season, the water will rise to and remain at such a height as will enable them to make it profitable to use it as a highway for transporting logs to market or mills lower down. When prudent business men may regulate their expenditures with reference to the anticipated rise, the stream becomes a factor in conducting the commerce of the country. *Walker* v. *Allen, supra; Little Rock* v. *Brooks, supra; Felzer* v. *Robinson,* 3 Oregon; *Thunder Bay Co.* v. *Speeksly, supra; Morgan* v. *King,* 35 N. Y., 454. This is one of many instances illustrating how, looking always to the reason upon which the common law was founded, its princi-

ples may be expanded so as to meet the exigencies arising in the development of a new country under conditions that did not exist in England.

There was evidence introduced by the plaintiff, and undisputed, tending to show that the river had been utilized for floatage for fifteen years for a distance of twenty-five miles, at least, above the trap, thus offering a channel for shipment to a large territory and numerous persons, and that one person had cut four million feet of lumber into it in one month. While a short stream or arm of a bay might not be declared a highway for the convenience of a few persons interested in a small territory, the right to the easement may always be asserted when there is "a capacity for valuable and extensive floatage." *Moore* v. *Sanbourne, supra; Wadsworth* v. *Smith,* 26 Am. Dec., 525; *Rhodes* v. *Otis,* 73 Am. Dec., 439. The witness Zachary testified that he had lived on the French Broad river since the year 1869, and there had been a great deal of high water every winter since that date, except the two last winters, but during those two it had been high enough to float logs.

I believe that the majority of the Court concur only in the view that the testimony left the question whether the French Broad river below Asheville was shown to be capable of floating logs to market during the winter season in dispute, and that the jury should have been allowed to pass upon it. As I interpret the testimony, no witness stated that logs could not be floated during every winter. It is probable that all would have testified that it was impracticable to float rafts either above or below Asheville, or in any stream west of the Yadkin.

If the streams are only open as a highway for logs in that shape, the enforcement of the rule would prove an embargo upon that species of commerce on every stream where rocks and shoals abound, and render it necessary to condemn the beds of such streams and blast out the rocks before they can

GWALTNEY *v.* TIMBER AND LAND CO.

be utilized as public highways. *Town of Pierreport* v. *Loveless,* 72 N. Y., 212; *Walker* v. *Board of Public Works,* 16 Ohio, 540.

But it seems to me that if the river above Asheville had been profitably used for fifteen years for floating logs to mills located there, it would be presumed that, according to the laws of Nature, the stream, which was growing larger and more powerful below, would be, for the same period, capable of profitable use in floating single logs. The immense rocks below might burst rafts asunder, but while a stream which had been cleared out for navigation above Asheville, might be too rough for steamers, but, according to all observation and experience, it could not have been so small or so rugged that it could not be relied on for transporting logs.

It appearing from the testimony that a large number of logs had been floated by the defendant, its agents and others, from points above the dam, and had reached their destination below without stopping, the fact that a number may have been washed ashore or drifted against rocks or other obstructions in the river and remained until started from their places of lodgment in nowise affects its navigability. Wood, *supra,* sec. 588; *Wood* v. *Chadbourne, supra.*

The Tar river, between Tarboro and Greenville, in our own State, is usually too low for several months in each year for navigation by the steamers that ply between the two points, and the rains that raise the river do not recur at fixed periods any year, yet they come with such regularity that the riparian planter may calculate on transporation by water for his cotton crop with absolute certainty during the winter months. No one would contend that Tar river is not navigable by small steamers. Though logs might drift ashore when the waters are subsiding, there would, of course, be no room for dispute as to its capacity to float logs also.

The plaintiff rests his claim to damages upon the fact, which the testimony tends to prove, that more than one hundred and fifty logs belonging to the defendant lodged against

his dam on the evening before the fish-trap was swept away. Granting this to be true, and conceding, as we have shown, that the French Broad is a floatable stream or highway, the defendant, in common with all other citizens, had an easement with the rights incidental to its exercise, while the company, or its agents, were pursuing the usual plan in trusting its logs to the current, and were not wantonly and purposely thrusting them upon any dam, where the natural tendency of the stream was to carry them around it, they could incur no liability to answer in damages to any riparian proprietor, especially to one whose interest in the soil extended only *ad filum aquæ*, while, according to his own testimony, he had left but little over one-third of the stream open. *McNamee* v. *Alexander*, 109 N. C., 242; *State* v. *Glen, supra; Watts* v. *Boom Co.*, 52 Mich., 203; *Union Mills Co.* v *Sheno*, 66 Wis., 476; *McPheeters* v. *L. D. & Co.*, 78 Miss., 329. The defendant, having the dominant right of navigation for the purpose of transporting logs, was under no greater legal obligation to look after the safety of a dam attached to a fish-trap, by conducting the logs around it, than the commander of a steamer would have been in passing through a navigable sound to steer around a fish-net that had been set across the channel. *Hettrick* v. *Page*, 82 N. C., 65; *State* v. *Glen, supra; State* v. *Narrows Island Club, supra;* Angell on Watercourses, §§ 558, 659, 350; 3 Lawson Rem., § 2936; *Davis* v. *Winslow*, 81 Am. Dec., 580.

If the plaintiff had the right to construct a dam as far as the center of the stream, his outer boundary, still the defendant had the superior right to enjoy the easement in the whole stream; and if in floating his logs in the usual way they came in contact with the dam, the company incurred no liability for loss from consequent injury to the fish-trap. *Davis* v. *Winslow, supra;* 26 Am. Dec., 530; *Walker* v. *Shepardson*, 4 Wis., 495; *Yeates* v. *Judd*, 18 *Ibid*, 118.

We think that, according to the testimony, in any aspect' of it, the injury to the dam was caused by the drifting of logs, that were being transported in a lawful manner, against it. If we concede, for the sake of argument, that the riparian proprietor had the right to construct the dam and that the defendant's agents were not authorized to treat it as a public nuisance and purposely tear it down in order to open a channel for the passage of its logs, still the plaintiff, upon the principle stated, and according to the authorities cited, could not recover for the failure of the defendant to keep the logs off the dam or trap. *Hettrick* v. *Page, supra.* In the exercise of a subordinate right it was incumbent on the plaintiff himself, in the most favorable view of the law for him, to guard against possible injury from such cause, either by leaving an opening in the dam where the current would naturally carry the logs, or by steering them as they approached around the western end of it. *Brown* v. *Chadbourne, supra; Lancey* v. *Clifford,* 92 Am. Dec., 561; *Gorman* v. *Benson,* 77 Am. Dec., 435; *Grand Rapids* v. *Powers,* Albany Law Journal,. February 13, 1892, p. 148.

If section 1123 of *The Code* can be construed to affect the merits of our case at all, it at most gives the sanction of the law to the erection of a dam for two-thirds of the distance across a stream in which the public have an easement for transporting logs, but in subordination to the superior right to the use of the highway for that purpose.

While I understand that a majority of the Court thus far have concurred only in the view that there was error in refusing to submit the case to the jury, I have submitted my views, in dissenting, upon every aspect of the case, and at length, because I am firmly persuaded that the future development of all of Western North Carolina, and especially of that section located on the waters of the Mississippi, depends. more upon the ultimate decision of the points involved in this case than upon any or all other contingencies.