# CASES

## ARGUED AND DETERMINED,

IN THE

# SUPREME COURT OF MINNESOTA.

### JULY TERM, 1852.

---

CASTNER, ET. AL. *v.* STEAMBOAT DR. FRANKLIN.

Where counsel requests the Court to charge the Jury on a number of propositions collectively, and the Court refuse to charge as requested, if any one of the propositions is not correct, error will not lie for such refusal. Per FULLER, J.

Counsel must state the precise point which he wishes decided, and if the decision is against him, he must except to it specifically.

The Mississippi River is a navigable stream, and the principles apply in regard to its navigation as to streams navigable at common law. Per MEEKER, J.

ERROR TO THIS DISTRICT COURT OF RAMSEY COUNTY.

The plaintiffs proceeded by attachment against the Steamboat Dr. Franklin, for damages done to logs of the plaintiffs, by the said boat, in a slough near the upper landing, in St. Paul. The cause was tried at the September Term of the said Court, 1851, and a verdict rendered in favor of the plaintiffs for $150 and costs.

The defendants sued out a Writ of Error from this Court. The facts sufficiently appear in the opinion of the Court.

RICE, HOLLINSHEAD & BECKER, for the Plaintiffs in Error.

BABCOCK & WILKINSON, for Defendants in Error.

*By the Court*—MEEKER, J. This is a special proceeding pursuant to the act entitled "an Act to provide for the collection of demands against boats and vessels," found in the Revised Statutes, Laws of Wisconsin Territory, pages 168-9-70. On the 4th of August, 1851, the plaintiffs below obtained a warrant for the seizure of the boat, which was executed on that day, being based upon a complaint verified by Castner, one of said plaintiffs. It set forth that the plaintiffs were partners, doing business under the name of John M. Castner & Co., that they were lawfully possessed of 48 saw logs, of the value of $160, lying in a slough near what is commonly called the Upper Landing in St. Paul; that they were not in the channel of the Mississippi River, but were lawfully boomed and secured. On the 2nd of June, 1851, the said boat, being under the management of the captain, officers and pilot, unlawfully ran into the said slough, and unlawfully ran against the boom by which the said logs were confined, and thereby greatly broke, damaged and injured the said boom, and thereby the said logs of the plaintiffs were lost, floated away and destroyed. Further:—at and before the time aforesaid, the plaintiffs were lawfully possessed of a quantity of hard wood saw logs, of the value of $160, then lawfully lying at or near a saw mill, known as the upper saw-mill, in St. Paul; which logs were lawfully secured by a boom around them, made for that purpose, and were out of the main channel of the Mississippi River. Yet the said boat being under the management of the master, and through his management unlawfully ran into the said slough, and unlawfully broke and damaged the boom, and thereby, said logs, to wit: 48 hard wood saw logs, of the value of $160, floated away, and thereby by reason of the unlawful breaking of the said boom as aforesaid, the plaintiffs suffered great loss and damage, to wit: $260. This is the substance and language of their complaint. To this the defendants, the owners of the boat, answered and pleaded as follows:—That the said steamboat, Doctor Franklin, did not commit the acts and injuries in manner and form as the plaintiffs have above thereof complained, nor any nor either of them. That if said logs in said boom mentioned, were lying and being at the place therein set forth, they were unlawfully obstructions to the free navigation of the

Castner et. al. v. Steamboat Dr. Franklin.

Mississippi River, were in said river, and subject to be removed and abated as public nuisances, and that the course and direction of the said steamboat Doctor Franklin, at the time and place in the said complaint mentioned, were on and in a public highway, free of passage to all boats and vessels of every citizen of the United States; and that the said steamboat, Doctor Franklin, could not in any other manner, or by taking any other course or direction, land her passengers and freight at the upper landing, &c.

The cause was tried at the September term, 1851, and a verdict and judgment for $150 and costs, were rendered for plaintiffs. This judgment is impeached in the assignment of errors, on the ground that the judge who tried the cause misdirected the jury, and refused to give the instructions as asked by the counsel for the defendants.

The first question of any moment that arises on the record before us, and that upon which the defence mainly is made to depend, is whether the Mississippi is, in the legal acceptation of the term a navigable river; for if it be not, then the right, privilege and exemption relied on by the defendants are seriously abridged and modified. If it be such a navigable stream, *then* the rights of the plaintiffs in this cause are favored and fortified by the rights that result to the public. By the common law, that was a navigable stream only in which the tide ebbed and flowed, and to the extent only of such ebb and flow. The soil under the river navigable in this sense of the word, does not belong to the Riparian proprietors, but to the public. The adjustment of controversies between individuals and the public in England and America, has been by ascertaining the extent of the flowing of the tide where such controversies arose on rivers thus defined to be navigable. This contracted view of the subject, afforded by the common law, proceeds from the fact, that that system arose by the almost imperceptible progress of ages, in a country of limited extent, which contains but two rivers, the Thames and Severn, of any use to the public for navigable purposes, up both of which the tide ebbs and flows. As England had but these, it was natural for the law of that country to prescribe the ebb and flow of the tide as one of the essential qualities of a navigable river. In the early settlement of the

United States, the colonists brought along with them the common law, which was the birthright of Englishmen, and adopted as their rule of right, action and propriety, qualified only so far as their new condition and home rendered certain provisions of it inapplicable or unnecessary. In this manner the definition of a navigable stream gained currency among the colonists by tacit consent, at a time when steam propellers were unknown, and our rivers little used by other craft. Thus, before art and the internal trade and commerce of our country had developed the value of our majestic watercourses, an arbitrary rule had excluded many of them from the dignity and character of navigable waters, *eo nomine*—attended with all the legal consequences and inconveniences, not to say absurdities, resulting to the public and to individuals, from such a construction. Under the application of this authority, the public have been incommoded by the successful assertion of 'the technical rights of Riparian proprietors. The navigation of large streams has been embarrassed and impeded by individual ownerships and improvements. Lands bounded by navigable rivers, have carried as incidents of this circumstance, the exclusive right to the soil to the middle of the stream, and where they were united in the same person on both sides of the river, such person has exercised the exclusive control of the entire channel adjacent. Such is the origin, progress and operation of this principle of the common law.

We do not think that the ordinance of 1787, so far at least as the Mississippi is concerned, has worked any change of the law upon this subject, and are of opinion, that if this river is navigable, in that sense that will secure to the public all the rights, privileges and immunities incident to streams navigable at common law, it must be so from other reasons and different authority than that celebrated law. The language of the ordinance above alluded to is, that "The navigable waters *leading into* the Mississippi and the St. Lawrence, and the carrying places between the same, shall be *common highways*, and forever free as well to the inhabitants of said territory as to the citizens of the United States, and those of any other State that may be admitted into the confederacy, without any tax, impost, or duty therefor." There was obviously no intention

Castner et. al. *v.* Steamboat Dr. Franklin.

on the part of Congress to constitute these vast rivers, two of the largest in the world, mere highways for travel and commerce, for that would have been to declare them something less than navigable rivers, by leaving the rights of Riparian owners the same with owners of land bordering on public roads and ways, restricting the privileges of navigators and craftsmen to low water mark, and in derogation of some of the most important rights, essential to the public use, which are always implied and enjoyed with impunity, on streams that are navigable in the legal meaning of that term. Besides, at the time of the passage of the ordinance in question, the mouths of the Mississippi and of the St. Lawrence, were within the dominions of foreign powers, and under their exclusive control. Spain commanded the mouth of the Mississippi, and Great Britain, the St. Lawrence ; so that the United States had no authority by a new declaratory act to impart to those rivers, any such quality or any higher or lower one. But we think the language of the ordinance is not susceptible of such a construction, and as already stated, does not embrace the Mississippi. Does then the common law apply arbitrarily in reference to this subject, and are we to be bound by it in the decision of this case ? Or shall we assume that, owing to the conceded navigability of the Mississippi, and the palpable absurdity of considering it a private stream, that in this respect, the common law is not applicable to our local situation? This has been the course of the Supreme Courts of the States of Pennsylvania and South Carolina, and perhaps some others. *See Carson vs. Blazer*, 2 *Bin. Rep.* 475; *Shunk vs. Schuylkill Navigation Co.*, 14 *S. & Rawle*, *p.* 71; *Cates vs. Waddington*, 1 *McCord Rep.* 580. See also 3 *Devereux*, (*N. C.*) *Rep.* 79. From the view, however, we have taken of the law in this case, we have not deemed it necessary to declare judicially, that the principle of the common law we have been discussing is not applicable to our situation.

We think from the policy of our Government, evinced in the administration of its public land system, and the repeated Legislative recognitions thereof, the National Legislature has clearly enough controlled and limited the common law rule in regard to this subject. In the disposition of the public domain it has from the beginning, reserved the Mississippi and the soil

it flows over from its surveys and grants. The surveyors in its employ, have always bounded their plats by the meanderings of its banks, and its patents have been issued to individuals only to the same extent. It is obvious that what has not been so let to and vested in individuals, still remains in the Government, for the use of the public which that Government represents. The conclusion then we have come to is, that the Mississippi is in *law*, as in fact, a navigable river—and that all navigators and craftsmen of whatever description thereon, enjoy the same rights and are entitled to the same exemptions, that they would have had on rivers navigable at common law, among which is the right to land freight and passengers and to receive the same on its banks, and this privilege extends to high water mark. This is, however, a right subject to some qualifications, or rather, it being a privilege in derogation of private rights, should for that reason, be strictly confined to the purposes and objects for which it was designed. It is a right, too, which like all others however absolute, must be so exercised as not to interfere with the legal rights of individuals—in other words, the privilege must not be abused.

In this case it is contended by the counsel for the defendants that the slough in which the logs were boomed, is a part of the channel of the Mississippi proper, and that therefore navigators and boatmen enjoy the same rights and exemptions on it, to which they may be entitled on navigable rivers. We do not think the proof justifies this conclusion. The most that can be conceded and argued is, that there is an inlet above and an outlet below, in the rear of the warehouses on the main bank of the river, and that a portion of the season the entire bottom from the base of the bluff to, and including the main bank, overflows during high water and freshets sufficiently to admit steamboats, and rendering it convenient to land freight and passengers at Elfelt's warehouse, near the foot of the bluff. Nevertheless, this whole bottom is now comprised within, and constitutes a portion of the town of St. Paul, being laid out in streets and lots more or less valuable as town property. We do not therefore consider it as completely condemned to the purposes of navigation as the channel or the bank near the

two warehouses. Nor do we think the proprietors thereof should be considered guilty of erecting a public nuisance, if they were to use it for booming logs, erecting buildings, or making any other improvements thereon, conforming to and respecting the plat of St. Paul when the streets are opened, though it be used sometimes during the high water, or freshets, for a steamboat landing. And even if it were indeed a part of the Mississippi proper, as counsel would contend, it is by no means certain that the logs in question, which do not appear in the evidence to have been moored there for any permanent purpose, may not, for aught that appears, have been confined there temporarily, or until the owners could find a market for them, or raft them for the lower country. In this latter view of the case, we are of the opinion the owners had the same right to use the *navigable* waters of the Mississippi as the owners of a steamboat, and we will add, the same right to protection from injury, and exemption from invasion.

In regard to the ruling of the Court below, we are inclined to the opinion, that there is no such error in it as should be cause of reversal in this case. The instructions that were asked by the counsel for the defendants, and which the Judge refused to give, we are all of the opinion, after a careful examination, should have been rejected; and the directions to the jury, which were submitted through loose and incoherent propositions, yet as they appear relevant, and, when taken together, seem to cover the law of the case so far as appears in the evidence presented in the bill of exceptions, which, it will be noticed, contains no averment that it was all *the testimony heard at the trial*, upon which the instructions must be presumed to be based, we think, on the whole, the judgment should be affirmed with ten per cent. damages, exclusive of interest and costs, which is ordered accordingly.

Fuller, J. The plaintiff in error, who was defendant below, relies for a reversal of the judgment against him, upon the refusal of the Judge at the trial to charge the jury as requested by his counsel.

The defendant's counsel submitted to the Judge, in a body,

Castner et. al. *v.* Steamboat Dr. Franklin.

eight propositions numbered consecutively, some of them involving several subordinate propositions, and all together covering more than two sides of a sheet of foolscap, closely written, and containing abstract rules of law, as well as principles applicable to the case in hand; and asked to have the whole administered to the jury as a charge.

If there was anything erroneous in any one of the propositions, the Judge did right to reject the whole. He was not bound to sift and hunt through such a mass to see whether he could find some proposition, or part of a proposition, which it would be proper to give as a rule of law for their guidance, to the jury; and his neglect or refusal to do so is not error, although it might have been if the same proposition or part of a proposition had been submitted to him separately, with a request that he should charge the jury in accordance with it; and his refusal had been specially excepted to. A Judge is not to be trapped by being called upon in the hurry of a trial, to analyze a mass of legal maxims and solve a long series of problems, and find the true result, on pain of having his decisions set aside if he errs. He is bound to look into them so far only as to see whether they contain anything improper for a charge, and if they do, may refuse the whole. The counsel himself must put his finger on the precise point he wishes decided, and take good care that his request is not too large, or his proposition too broad. And if the decision is against him, he must object to it specifically. When a general objection is made to the decision of a Court on the trial of a cause, and, on a review thereof, it appears that the decision, if erroneous at all, is only in part, such objection will not be available, from the want of precision in its statement at the trial. *McAlister vs. Read,* 4 *Wend.* 483. *Read vs. McAllister,* 8 *Wend.* 109. The same rule is applicable to the charge actually given. A general exception to his charge does not bring up any particular remark made by the Judge, or any omission in such charge, unless his attention was directed to the point at the time. *Camden & Amboy R. R. and T. Co. vs Belknap,* 21 *Wend.* 354. Wholesale exceptions are not allowed. The error, if any, must particularly pointed out. The rule is more strict in the Appellate Court, when the case comes up on error, than on a motion

for a new trial in the Court below.   *Archer vs. Hubbell*, 4 *Wend*. 514.

In the case under consideration, but one general exception was taken, both to the refusal of the Judge to charge as requested by the counsel for the defendant, and to the charge which he did deliver to the jury.   The exception is manifestly too broad, and covers too much.   Portions of the eight propositions submitted by the counsel are little more than abstract rules of law, and other portions are otherwise objectionable. His request was not that the Judge should submit any particular portion of them, but that he should give the whole to the jury as a charge.   No particular portions of the charge delivered was excepted to, but the whole of it.   It was not all wrong, although much of it was harmlessly irrevalant.

The 8th proposition submitted by the defendant's counsel, "That if the steamboat Doctor Franklin was prevented from passing up the public street to the ordinary landing in high water, by the log rail or other obstruction extending from the steam mill, that then the said boat might lawfully pass over the water on the land adjacent, notwithstanding a boom for securing logs might be removed thereby," can hardly be maintained upon any established principle of law.   There is no pretence that the street in question was ever opened, worked or used as such by the public.   And if it were, streets are not designed for navigation by steamboats.   That is not one of the public uses or easements with which the fee of the land is burdened.

The substance of the 7th proposition is, that the Doctor Franklin committed the injury complained of, in abating a nuisance which obstructed the passage of a street, never opened or used as such, and at the time under water.   This is a far-fetched and untenable defence.   There were other objectionable matters in the defendants' propositions, but these are enough for examples.   And the exception covered these, as well as that part of the charge made, in which the Judge in effect charged against the first proposition, and instructed the jury that if they believed the public interests could have been subserved by landing anywhere else, then the boat was bound to land there.

If error was committed by the Judge in his charge, or in his refusal to charge, the defendant does not come to this Court in a situation to take advantage of it. We must presume that the Judge would have complied with a lawful request, and that if any particular part of his charge was wrong, he would have corrected it if that portion had been excepted to.

Concurring for the most part in the reasoning of my learned associate, I have by another way arrived at the same conclusion: that the judgment of the Court below should be affirmed.