HELEN OBEE DANA, *Appellee,* v. FRED HURST *et al.* and THE STATE OF KANSAS, *Intervenor, Appellants.*

No. 17,653.

SYLLABUS BY THE COURT.

RIPARIAN RIGHTS—*Bed of Arkansas River—Title—Navigation.* The title to the bed of the Arkansas river within the boundaries of Kansas is in the state.

Appeal from Reno district court.   Opinion filed November 11, 1911.   Reversed.   Rehearing allowed, December 18, 1911.   Opinion on rehearing filed April 6, 1912.   Reversal sustained.

*F. Dumont Smith,* for appellants Fred Hurst *et al.*

*John S. Dawson,* attorney-general, for the intervenor.

*F. F. Prigg,* and *C. M. Williams,* for the appellee.

The opinion of the court was delivered by

WEST, J.:   Plaintiff sued to recover possession of certain land in Reno county, bounded on the north by the Arkansas river.   The defendant claimed a portion of the tract under a school-land purchase and on the theory that it is an island in the bed of a navigable stream and therefore subject under chapter 378 of the

Laws of 1907 (Gen. Stat. 1909, § 8202), to sale as school land. The plaintiff contended that this portion of the tract was an accretion and denied the navigability of the river and the existence of an island. All of these questions were submitted to the jury, who found generally for the plaintiff. The defendant appeals, and insists that the court should take judicial notice that the Arkansas river is navigable in such sense as to vest the title of the bed in the state. Instructions were requested to the effect that the beds of all rivers navigable or meandered belong to the state and that a riparian owner has no interest in islands formed therein. The one clear question on which a decision is sought is, Who owns the bed of the river? It is argued that from public records, declarations and enactments we should judicially regard the river as set apart for a public highway for interstate commerce, its bed thereby vesting in the state. It is not pretended that the river is now navigated or navigable in fact in Kansas, and the court, as well as everybody else, knows that it is not. But does this conclude the matter? We take judicial notice that the Arkansas is the largest affluent of the Mississippi except the Missouri, that it is 2000 miles long, draining an area of 189,000 square miles, and is navigable for more than 600 miles up from its mouth, that through its long course in Kansas both of its banks were meandered by the government surveyors, that its average width is about one-fourth of a mile, and that several appropriations, amounting in all to $59,000, for its improvement as far up as Wichita have been made by congress. (20 U. S. Stat. at L., p. 36; 21 U. S. Stat. at L., pp. 187, 477.) We also take judicial notice that from Wichita up to the west line of the state it is substantially the same in width, volume and character as from Wichita down to the southern boundary of the state. While the evidence offered on the trial indicated that the north bank is not meandered, the records in the auditor's office, of which we must take notice, show

that the stream was meandered as stated along its entire course in this state. We likewise take notice that in the act of February 20, 1811, to enable the people of the territory of Orleans to form a constitution and state government, it was provided that the Mississippi river and the navigable rivers and waters leading into the same or into the Gulf of Mexico should be common highways and forever free as well to the inhabitants of the state as to other citizens of the United States, without any tax duty, import or toll therefor imposed by the state. (2 U. S. Stat. at L., p. 642.) Similar provision was found in the act admitting Louisiana (2 U. S. Stat. at L., p. 703), in the act creating the state of Mississippi (3 U. S. Stat. at L., p. 349), in the act creating the Missouri territory, and in the act of March 6, 1820, authorizing a convention to constitute the state of Missouri. A similar declaration was made in the Ordinance for northwestern territory. Ever since 1796, government surveyors have by congress been directed to sectionalize the public lands and to divide them by north-and-south lines to the true meridian and by others crossing them at right angles so as to form townships six miles square, unless where "the course of navigable rivers may render it impracticable." (Gould on Waters, 2d ed., § 69, note 6.)

The act of May 17, 1796, provided that "all navigable rivers within the territory to be disposed of shall be deemed to be and remain public highways," and this has been followed by many other similar enactments. (*Railroad Company v. Schurmeir,* [7 Wall.] 74 U. S. 272, 288.)

Section 5251 of the Revised Statutes of the United States of 1878 provides that "all the navigable rivers and waters in the former territories of Orleans and Louisiana shall be and forever remain public highways."

In *Hardin v. Jordan*, 140 U. S. 371, it was said in speaking of a grant upon meandered navigable streams:

"It has never been held that the lands under water, in front of such grants, are reserved to the United States, or that they can be afterwards granted out to other persons, to the injury of the original grantees." (p. 381.)

In *Kregar v. Fogarty*, 78 Kan. 541, 96 Pac. 845, it was said:

"In disposing of public land bordering upon rivers it is not the policy of the government to reserve title to the lands under water, whether the stream be navigable or not. The government parts with its whole title, leaving the question of boundary, whether the shoreline or the thread of the stream, to be determined by the local law. In case of navigable waters in this state the boundary is at the bank, and the title to the bed of the stream is in the state." (p. 545.)

The general test of navigability is well stated in the language quoted with approval in *Kregar v. Fogarty*, supra, which in effect is, that any water to be navigable should be susceptible of use for purposes of commerce or possess the capacity for valuable floatage in transportation to market of the products of the country through which it runs, and should be of practical usefulness to the public as a public highway in its own state and without the aid of artificial means; that a theoretical or potential navigability, or one that is temporary, precarious and unprofitable, is not sufficient. But present navigability must not be confused with past navigability or setting apart for highway purposes, for we can not conceive or concede that the title to the bed of a navigable stream to-day in the state will to-morrow be in the riparian owner because the river has in the meantime filled up or ceased to flow. If when this land was granted to the patentee the title to the bed of the stream was in the state, it is in the state now, regardless of present navigation or present navigability. (*Wood v. Fowler*, 26 Kan. 682, 688.) The supreme

court of Iowa, In *Wood v. C., R. I. & P. R. Co.*, 60 Iowa, 456, 15 N. W. 284; held that an act of congress declaring a navigable river unnavigable does not extend the fee of a riparian owner to the center of the stream. It was said:

"We have been unable to discover any authority or principle upon which we could hold that the act had that effect. The case is somewhat like that of the vacation of a street. The boundary of the land abutting on the street is not changed. If the adjacent owner was the owner of the fee to the middle of the street, he would, of course, enjoy whatever benefit there might be in the extinguishment of the public easement. But if he was not the owner of such fee, the vacation of the street would not confer it." (p. 459.)

This was followed in *Serrin et al. v. Grefe*, 67 Iowa, 196, 25 N. W. 227, and referred to in *Brown v. Cunningham*, 82 Iowa, 512, 48 N. W. 1042. If an express declaration by the legislature or by congress that a river is unnavigable does not have the effect of divesting the state of title to the bed, then mere nonuse or the action of the elements diminishing the depth of the stream can not well have such effect. Originally the ebb and flow of the tide determined the navigability of a stream, but this ancient common-law test was found impracticable in this country for few of our rivers are susceptible to tidal influence; hence the ruling of navigability in fact was finally adopted, varying in different jurisdictions, both rules having reference more frequently to questions of control for purposes of actual navigation than to questions of riparian title. In a prairie country traversed by inland streams of great length, subject to recurring freshets and droughts and extreme evaporation, the test for title purposes can hardly be that applied to rivers like the Hudson surging to the sea with volume and between banks practically unaffected by soil or season.

For a generation or more land transportation has so far superseded the use of water craft in this region that

even the Missouri, a stream known to be navigable in fact and in law, has ceased to float upon its waters along the boundary of this state any appreciable commerce of the country, and the Kansas, which we have judicially noticed as navigable (*Wood v. Fowler*, 26 Kan. 682), floats none at all. In *Burroughs v. Whitwam*, 59 Mich. 279, 26 N. W. 491, in discussing a declaration in the Ordinance of 1787 in part identical with the one contained in the acts of admission referred to, it was held not to apply to every little rill or brook whose waters finally reached great rivers into a navigable stream, but that:

"It was intended to and did apply only to such streams as were then common highways for canoes and batteaux in the commerce between the northwestern wilderness and the settled portion of the United States and foreign countries and as to such rivers not then in use as would by law be embraced in the definition of 'navigable waters.'" (Syl. ¶ 3.)

If the fur trader's use of rivers by canoes and batteaux constituted navigability in the states mentioned in the Ordinance it might well be said that a stream of the length, width and present navigability for hundreds of miles, of the Arkansas, may have been intended by the declaration in these acts of admission. Do these declarations together with the present known character of the stream and its character then, together with the subsequent declarations and directions concerning surveys and the setting apart of navigable rivers for public highways and the later appropriations for the improvement of the streams, together with its meandering, fairly show a continued policy by the government to treat the Arkansas as a public highway, so that it might, whenever deemed proper, control it for such purpose? Suppose to-day the war department should send officers to establish harbor lines, and a force to dredge the stream. Who could rightfully stay the hand of the government? Would the officers be compelled to leave it to a jury to say whether the river opposite a certain

quarter section is navigable, and to another jury to de-
termine the question as to another quarter section, with
a possible result that its navigability and unnaviga-
bility would alternate with the varying views of differ-
ent juries? It is not a question of the probability or
possibility of such action on the part of the govern-
ment but one of power to take such action. If the
power exists it must be because the river has been and
still is set apart as and for a public highway of com-
merce by the means and in the manner already indi-
cated; and if when such purpose was first expressed the
stream was in fact and in law navigable according to
the needs and customs of that day, and is still navigable
even according to present needs and customs for a long
distance, who shall say that the government could not
before this have extended the length of its actual navi-
gability or that it can not now do so if it so chooses?
We are aware that it was said in *Harrison v. Fite,* 148
Fed. 781:

"Changes may occur, especially in small and unim-
portant waters, from natural causes, such as the grad-
ual attrition of the banks and the filling up of the bed
with deposits of the soil, the abandonment of use fol-
lowed by the encroachment of vegetation, and the selec-
tion by the water of other and more natural and con-
venient channels of escape, that work a destruction of
capacity and utility as a means of transportation; and
when this result may fairly be said to be permanent, a
stream or lake in such condition should cease to be
classed among those waters that are charged with a
public use." (p. 784.)

But it does not follow that the Arkansas is a small
or unimportant water or stream although it is indeed a
very peculiar and much of the time a very shallow one.
And even if the kind of stream mentioned should thus
cease to be navigable it does not follow that it might
not be opened up and put to public use by the United
States. A stream may be navigable in fact and in law
in spite of dams or other obstructions, and the govern-

ment may permit such obstructions to be placed in navigable rivers without destroying their character as highways of commerce. (*Wilson and others v. The Blackbird Creek Marsh Company*, [2 Pet.] 27 U. S. 245; *Huse v. Glover*, 119 U. S. 543; *Pound v. Turck*, [5 Otto] 95 U. S. 459; *Willamette Iron Bridge Co. v. Hatch*, 125 U. S. 1; *United States v. Bellingham Bay Boom Co.*, 81 Fed. 658; *Valentine v. Water-Power Co.*, 128 Mich. 280, 87 N. W. 370.)

The title to the bed can not, of course, be changed by thus interfering with the actual navigability of a stream, and it is not readily seen how its impediment by natural means could have a different effect from one caused by artificial means, or why the government could not in either case retain and exercise control if it so desired. In *United States v. Rio Grande Irrigation Co.*, 174 U. S. 690, it was held that the trial court properly found that the Rio Grande was not navigable within the limits of New Mexico, but it was further held that the United States could, nevertheless, prevent the diversion of its water in New Mexico so as to impair navigability below. It was suggested in the opinion by Mr. Justice Brewer that the government has the right to take all needed measures to preserve the navigability of the navigable watercourses of the country, even against any state action; that should a stream in the state of New York be diverted above its navigable portion so as to diminish its volume and destroy its navigability the jurisdiction of the government would arise and its power to restrain such diversion would be unquestioned. If this be true there is certainly some force in the argument that like power might be exercised in Kansas with reference to the river now under consideration. In *Union Bridge Co. v. United States*, 204 U. S. 364, it was held that although a bridge over a navigable water of the United States may have been lawful and not, when erected, an obstruction to commerce as then carried on, it may afterwards become

Dana v. Hurst.

such an obstruction and that congress may protect navigation by forbidding its maintenance. (See, also, *West Chicago Railroad v. Chicago,* 201 U. S. 506.)

In *Leovy v. United States,* 177 U. S. 621, it was charged that the defendant below had built a dam across a navigable stream of the United States known as Red Pass, which flowed into the Gulf from a certain navigable stream known as the Jump, and that the Jump was an outlet of the Mississippi into the Gulf. In the opinion it was stated that it was conceded that Red Pass was not a natural stream but in the nature of a crevasse caused by the overflow of water from the Mississippi, apparently formed sometime before the grant by the United States to Louisiana of certain swamp and overflowed land; that there was some evidence that small luggers or yawls sometimes went through the pass but not that passengers or freight were ever carried outside of Louisiana; that the pass had been steadily growing shallower and narrower, and that the so-called mouth next to the Gulf had been closed up and become a marsh, the trifling use that was made of the pass being restricted to the river end of the crevasse. The case of *Egan and Husband v. Hart et al.,* 45 La. Ann. 1358, 14 South. 244, was cited, which involved a bayou which had never been navigated between the dam there involved and the junction with another bayou. Between these points it was nothing but a highway outlet, going dry every summer, at many places choked with rafts and filled with sand reefs; that it had no channel, and in various localities spread out over shallow lakes and over a wide expanse of country, and was susceptible of being made navigable just as a ditch would be if it were dug deep and wide enough and kept supplied with a sufficiency of water. This was held to be not a navigable water of the United States, which judgment was affirmed in *Egan v. Hart,* 165 U. S. 188. *The Daniel Ball,* (10 Wall.) 77 U. S. 557, was also quoted, that:

"Those rivers must be regarded as public navigable

rivers in law which are navigable in fact. And they
are navigable in fact when they are used, or are sus-
ceptible of being used in their ordinary condition, as
highways for commerce, over which trade and travel
are or may be conducted in the customary modes of
trade and travel on water." (p. 563.)

It was said that the term "navigable waters of the
United States" has reference to commerce of a sub-
stantial and permanent character to be conducted
thereon, and that while it might not be easy to define
the size and character of a stream which would place it
within the category, yet in construing the legislation
before the court it was seen that it was not the in-
tention of congress to prevent state exercise of power to
claim swamp and overflowed land by regulating and con-
trolling the current of small streams not used habitually
as arteries of interstate commerce. The question of
state control for sanitary purposes was also involved
and discussed, and it was held that upon the record it
was not shown by adequate evidence that Red Pass was
a navigable water of the United States actually used
in interstate commerce, and a reversal was therefore
ordered. In the case of The Montello, (20 Wall.) 87
U. S. 430, involving the character of Fox river in the
state of Wisconsin, it was held that to bring it within
the navigable waters of the United States it must be a
river such as in its natural state to afford a channel for
useful commerce, and that the question of its naviga-
bility did not depend upon the mode by which com-
merce upon it was conducted, nor upon the difficulties
attending navigation, such as falls, sand bars and
rapids. Congress had granted Wisconsin a quantity of
land for the purpose of improving the river, providing
that when improved it should be and forever remain a
public highway for the use of the United States, etc.

The grant was accepted and a company was incorpo-
rated to make the improvements. A vessel was libeled
for noncompliance with certain federal regulations, and
the trial court held that as before the improvements the

river was not navigable, it was not, after such improvement, subject to federal jurisdiction. This ruling was reversed, and it was held that the government had jurisdiction and control. It was said:

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river." (p. 441.)

It was stated that prior to the improvement the river was in fact navigated by Durham boats, which had, in places, to be unloaded and the cargoes carried forward by land, and this sort of a stream was held to be within the meaning of the Ordinance of 1787, declaring free the navigable waters and carrying places between them. In *Chisolm v. Caines*, 67 Fed. 285, it was held that the question as to what is a public navigable stream is not one of local law, but of general law, as to which the federal courts are entitled to exercise an independent judgment; that in determining whether streams and arms of the sea traversing marsh land are public navigable waters, the test is whether they are, or are capable of becoming, public highways. In the opinion it was said:

"Nor does the answer to this question depend upon its depth, nor upon its width. It may have the capacity to float logs only, and yet be a navigable stream. . . . Nor does it depend upon an uninterrupted course, nor upon a channel free from obstruction, if these can be

removed. . . . Nor is it necessary that it shall at all times be passable—floatable. . . . If the stream, in itself, or in connection with others, forms a continuous connection, in whole or in part, between different places in different states, it is a navigable water of the United States." (p. 292.)

In *Moore v. Sanborne et al.*, 2 Mich. 519, it was held that streams are public if in their natural state there is capacity for valuable floatage, irrespective of the fact of actual public use, or the extent of such use; that it is not necessary that they should be susceptible of navigation by boats; that it is a valuable and not a continual capacity for use which determines the right. It is shown in the opinion that the common-law rule has been and must be modified so as to meet the conditions and wants of the public and the necessities of trade and commerce. Reference is made to the Ordinance of 1787 as fixing a rule for itself, "designed to extend over all streams which were capable of being used for any purposes of public utility." (p. 525.)

It was said in *The State v. Carpenter*, 68 Wis. 165, 31 N. W. 730, concerning Rock river, that there was a time, in the early settlement of the country bordering on this river, when it was practically and in fact navigable, "and actually used to a limited extent for the floating of logs, and perhaps for small boats and barges" (p. 171), but that since that time the forests had been denuded, and better means of transportation had come into use and the river had practically been abandoned. It was therefore held that, though a public navigable river, the obstruction need not be restrained, as it would not interfere with actual navigation.

In *Castner et al. v. Steamboat Dr. Franklin*, 1 Minn. 73, it was said:

"In the disposition of the public domain it has from the beginning reserved the Mississippi and the soil it flows over from its surveys and grants. The surveyors in its employ have always bounded their plats by the meanderings of its banks, and its patents have been

Dana v. Hurst.

issued to individuals only to the same extent. It is obvious that what has not been so let to and vested in individuals still remains in the government for the use of the public which that government represents." (p. 77.)

This is quoted merely to show the tendency of some courts to regard as very significant the fact of meandering the banks of a stream—which fact we must regard as persuasive though not conclusive. Indeed, Judge Mitchell, in *Lamprey v. State,* 52 Minn. 181, 53 N. W. 1139, in speaking of the title to certain lake beds, said:

"Without troubling ourselves to consider what were the rights of the United States in these waters before they conveyed the lands bordering on them, it is well settled that, having disposed of lands bordering on a meandered lake by patent, without reservation or restriction, they have nothing left to convey." (p. 192.)

The supreme court of Wisconsin, in *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273, held that Willow river, a tributary of the Mississippi, capable of floating logs at certain seasons of the year, and carrying rowboats, although not meandered, and so shallow that in places the boats have to be pushed, is a public navigable stream.

In *Morgan v. King,* (N. Y. Supr. Ct.) 30 Barb. 9, it was said:

"It is not necessary that that commerce should be transported in crafts or rafts that can be guided by the hand of man. The test of capacity is not alone in the nature or character of the craft, nor how guided, or whether guided at all. If it has capacity sufficient to transport to market the whole or a part of the commerce, no matter of what particular character, that grows or gathers upon its banks, it is subject to the public servitude. If it can do this, to that extent it is a public highway, within the principles of the common law." (p. 19.)

Mr. Justice Davis, speaking for the court, held, in *McLaughlin v. Manufacturing Co.,* 103 N. C. 100, 9 S. E. 307, that a stream is navigable in law which is

floatable, or capable of valuable use in bearing the products of the mines, forests and tillage of the country it traverses to mills or markets. True, the general and well-nigh universal rule is that to be navigable in law a stream must be navigable in fact, and the authorities to this effect are legion, but the authorities as to what constitutes navigability in fact are conflicting, those here referred to being among the ones prescribing the rule of least strictness, and they are referred to for the purpose of ascertaining whether the river in question was navigable, as navigation went in those days when the public declarations were made, for, as said in the leading case of *McManus v. Carmichael,* 3 Iowa, 1, "the real test of navigability here is ascertained by use, or by public act or declaration." (p. 31.) But we may properly ascertain from sources open to all what knowledge can be gained as to the character of the stream in days gone by. Volume 14 of the Transactions of the Kansas Academy of Science for the years 1893 and 1894, now on record in the State Historical Society, contains an article on the Arkansas river, from which we take the following:

"The Arkansas is the largest river in the state of Kansas, and was considered a navigable river to the mouth of the Little Arkansas by the United States government. When the country was surveyed its banks were meandered, leaving a river bed of 800 or 1200 feet in width as the property of the general government, and to some extent the river was used in Kansas as a highway of travel and traffic until the coming of the white man, who robbed it of its water and exterminated the millions of bison and other forms of animal life which once grazed on the bordering luxuriant meadows and quenched their thirst in its rippling waters. The writer's observation of the rivers of Kansas only extends back to 1859. At that time and until some years after the settlement of the country, the Arkansas was a river in fact as well as in name, usually flowing from bank to bank. From Mr. William Mathewson, a noted plainsman, I learn that as early as 1852 boats were built at Pueblo, Colo., in which mountain

traders and trappers, sometimes in parties of fifteen or twenty in one boat, with their effects, floated down the swift current of the river to Arkansas, and from 1870 to 1880 boats were built at Wichita to descend the river, some propelled by steam; in one instance two young men built a boat at Wichita and navigated river and gulf to Florida.

"At that time the river had apparently pursued its accustomed way unchanged for centuries; it had well-defined banks, with a width of 800 to 1200 feet, the river very seldom overflowing the valleys, but a few feet higher than its level. . . . Before the settlement of the country the bordering plains were tramped hard and eaten bare by innumerable buffalo, allowing the rainfall to speedily flow into the ravines and creeks, thence to the river, as from a roof. The breaking up of the soil consequent upon the settlement of the country allowed the rainfall to soak into the ground, and the river soon ceased to carry its usual volume of water, not noticeable until about 1880. In addition to this, numerous irrigating ditches were dug in western Kansas and in Colorado, sufficient at the present time to divert the entire water of the river to the thirsty plains. Thus for the past ten or fifteen years we have observed the evolution of a great river into a sandy waste or insignificant stream. . . . This wonderful change has been brought about by our so-called civilization within the last fifteen years. Fortunate, indeed, are those who were permitted to behold the beauties of this valley and river when it was the home of the Indian and buffalo—just as God made it." (pp. 111, 112.)

From another document compiled recently and now on file in the same office it appears that:

"The Arkansas is accounted the most important of the western tributaries of the combined Mississippi and Missouri rivers, is about 2000 miles in length, of which 310 are in the state of Kansas. The stream is rarely navigable to a point above Ft. Smith, though in times of flood the channel is open to boats of light draft to a point much higher up. In 1854 a writer in the New York· *Tribune*, in describing the territories of Kansas and Nebraska, gave Fort Mann (near Dodge City), as the 'head of navigation' on the stream. Dur-

ing the '70's steamboats were run up the river as far as
Arkansas City, among them being the 'Aunt Sally,'
'General Miles,' 'Cherokee,' 'Necedah,' 'Nonesuch,' and
'Kansas Millers,' the last-named boat being built in
1884 for the purpose of trading down the river. Some
barges and flat boats were also built at Arkansas City
for the purpose of freighting wheat and flour down the
stream. With the passing of the 'Kansas Millers,' all
efforts at navigating the river in Kansas were aban-
doned." (Manuscript Dept., Kan. State Historical So-
ciety.)

This article goes on to state that very much of the
stream has been diverted for irrigation purposes.

As far back as 1831 the general assembly of the
territory of Arkansas requested an appropriation for
removing snags and other lodgments of timber up to
Ft. Smith. (22d Cong., 1st Sess. vol. 5, House Ex.
Doc. No. 227.)

In a report by Col. J. J. Abert to the secretary of
war, January 23, 1854 (33d Cong., 1st Sess., vol. 5, Sen.
Ex. Doc. No. 26), it was stated that the Arkansas river
was navigable only to the junction of the Arkansas,
Verdigris and Neosho, a little less than 600 miles from
its mouth.

In a report by the assistant engineer, January 27,
1879 (45th Cong., 3d Sess., vol. 16, House Ex. Doc.
No. 94), it was stated that the portion of the country
tributary to the river in Kansas from Wichita to the
state line would derive great benefit from the opening
of the river to navigation but that it was questionable
whether the expense would be justifiable.

January 23, 1886, Capt. Taber reported to the Chief
of Engineers (49th Cong., 1st Sess., vol. 30, House Ex.
Doc. No. 90), among other things, that:

"There is no doubt but that a two-foot channel can be
provided whenever development of the country war-
rants it; and the river should be, for all purposes of law,
rated as navigable to Wichita, Kansas."

He speaks of the river, beginning at Arkansas City,

Dana v. Hurst.

as one which may be rated with a large number of rivers then undergoing improvement ·for the use of light-draft boats.

These reports, together with the fact that various appropriations were made ·by congress, would indicate that up to 1886 the war department entertained no doubt of the power of the government to improve the river, and if such power could have been exercised up as far as Wichita it is impossible to deny such power up to the western border of the state.   The fact that complaints were made in the early part of the century concerning obstructions in ·Arkansas, and the further fact that appropriations were made for their removal, indicate that similar removals might have been made farther up had the government so desired.

In answer to all this it may be said that the only sensible and practicable basis of determination is ·the familiar one of present navigability in fact, and that to hold that this stream is navigable is equivalent to ruling that sand may be navigated.   But let it be said once more that present navigability is not and can not be determinative.   If we are forced to hold that the river was navigable in fact when set apart as a public highway, then we are compelled to hold that it is still thus set apart, or else that in some way this setting apart has been abrogated, the power of the government lost, and the title to the bed of the stream diverted. We have been pointed to no reason or authority for holding the latter and can find none.   There is no indication in any public act or declaration that the intention was to set apart for a public highway only so much of a stream as might from time to time, without improvement, remain navigable in fact.

We must meet conditions as we find them.   As already suggested this stream is now navigable for more than 600 miles above its mouth, and the testimony showed that within the present generation actual navigation was to a slight extent carried on as far up as

Wichita. It seems anomalous and absurd that it must be left for a jury to say that the same stream, of the same general width, volume and character, may, during its hundreds of miles' flow through this state, be at one point navigable in fact now and at another not; and then that it must be held that at one of such places it is also navigable in law and at the other unnavigable in law, it being within the possibilities that still another jury might find that the same stream still higher up is navigable. Thus the title to the bed would be left shifting and uncertain, according to the way different juries might determine the question as a matter of fact. The question as to when a stream once navigable ceases to be so by nonuse or by the accumulation of sand or soil is one on which we have been afforded no light. But considering the character, width and length of the river, the various acts and declarations by congress in reference thereto, and the policy shown thereby with reference to waters which more than one hundred years ago were navigable according to the needs and uses of that time, and which led into the Mississippi, we deem it justifiable to hold, and do hold, that while the stream is not now navigated in fact anywhere in Kansas it has, nevertheless, not ceased to be a highway set apart by national act and declaration for public use in the manner and at the time to be determined upon by the federal government. This being true, the title to the bed is in the state, and islands therein not surveyed or claimed by the government belong also to the state, and under the act of 1907 may be sold as school land. (Laws 1907, ch. 378, Gen. Stat. 1909, § 8202.)

It is not the ordinary question of navigability in law, depending upon present navigability in fact. It is one rather of governmental intention, declaration, acts and power considered in connection with the character and history of the stream.

This ruling does not necessarily determine this case, because it is disputed and the evidence was conflicting

as to whether the island ever existed as claimed by the defendant, and also whether the land in controversy is not an accretion to the land of the plaintiff. The question of ownership of the bed does not affect the right of the riparian owner to accretions. (Gould on Waters, 2d ed., § 76.) It may also be said that counsels' theory that meandering by government surveyors fixes the boundaries of the patented land regardless of riparian rights can not be upheld, the general, if not the universal, ruling being that the line so fixed is merely for the purpose of determining the quantity of land granted, and the watercourse and not the meander line is the boundary. (*Peuker v. Canter,* 62 Kan. 363, 63 Pac. 617, and cases there cited.)

This ruling renders the instructions given by the trial court erroneous as to the question of title to the bed as affected by present navigability, and the judgment is therefore reversed and the cause remanded for further proceedings in accordance herewith.

JOHNSTON, C. J. (dissenting) : In my view there is no basis for holding that the Arkansas river is or ever was navigable at and west of Hutchinson, Kan. It is settled that rivers are to be regarded as navigable in law which are navigable in fact, and they are not navigable in fact unless they are capable of use in their natural condition as highways of commerce upon which commerce of the region may be carried on by the ordinary methods of water transportation. The title of the land in question depends upon whether the Arkansas river is or ever was a navigable river. Both parties, as well as the trial court, proceeded on the theory that the navigability of the river at this point was a matter to be determined by evidence, and, upon the evidence introduced, it has been found that the river in Reno county can not, for the purposes of this case, be regarded as navigable. As against this finding the court is asked and does hold that the navigability of the

river at this point is so notorious and generally known that the court can take judicial notice that it is navigable. On the other hand, it seems to me that it is a matter of common knowledge that the river is not navigable at any point within the state. The court might assume that it is navigable from its mouth up to Fort Smith and that whether it is navigable above that point is a question to be determined upon evidence.

It seems that in an early day small boats passed over the river a few times as far up as Wichita, but occasional boating, in times of high water, does not make the stream a navigable river. Appropriations were made, it is true, which contemplated an examination of the river as far west as Wichita, but the engineers found, what was generally known, that this part of the river was not navigable. It may be granted that if it had been found navigable at an early day and the title to the bed of the river had vested in the state, its title would not change if, for some reason, the flow was so diminished that the river could not be used for transportation, but no basis is shown or apparent in the history of the river for an inference that it had been used, early or late, as a highway of commerce in or above Reno county by any of the customary methods then in use. In one authority cited in the prevailing opinion it is stated that the river is rarely navigable above Fort Smith, but that in times of flood light boats can go to a higher point. An earlier authority cited in the opinion states that the river is not navigable above the points where it is joined by the Verdigris and Neosho rivers, which is only about six hundred miles from its mouth. Substantially all the records and history of the stream are to the effect that the use of the river for boating above that point was temporary and exceptional, and, as said in *Harrison v. Fite,* 148 Fed. 781, a navigability "that is temporary, precarious, and unprofitable, is not sufficient. . . . To be navigable a watercourse must have a useful capacity

Dana v. Hurst.

as a public highway of transportation." (p. 784. See, also, *Kregar v. Fogarty*, 78 Kan. 541, 96 Pac. 845.) Who can say that such a capacity of the Arkansas river has ever existed in Kansas? In *United States v. Rio Grande Irrigation Co.*, 174 U. S. 690, the effect of an occasional use during flood periods was considered. Justice Brewer said that "the mere fact that logs, poles and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river" (p. 698), and quoting from Chief Justice Shaw he added that "it is not, however, every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture." (p. 698.) Now the fact that the lower end of a river which is two thousand miles in length is recognized to be navigable is no basis for inferring that it is navigable up to a point near its source, and the fact that boats have been occasionally floated down from Arkansas City and Wichita is no reason for assuming that they have been floated down the river from points in western Kansas. In *United States v. Rio Grande Irrigation Co.*, supra, it was held that the Rio Grande river, the lower end of which is well known to be navigable, was not navigable in New Mexico. It was there said that the court would not take judicial notice of the point in a river between its mouth and its source where navigability ceased, and that although, speaking generally, the Rio Grande was navigable, the court could not know how far up the river navigability extended, and that, therefore, the question whether the river was navigable in New Mexico was a question to be decided upon evidence. That river in New Mexico, which, it seems, approaches much more closely to a navigable stream than the Arkansas river does in Kansas, was held not to be navigable by the supreme court of the United States.

A few things may be cited as tending to show navigability of the river below the junction of the Little Arkansas river near Wichita, but what is there to show past or present navigability west of that point? Nothing which I can find, outside the mere meandering of the banks of the stream, and it is conceded that this does not warrant the assumption that it is navigable since this is done to ascertain the quantity of the land to be sold and paid for and not to determine the navigability of the stream. (*Kregar v. Fogarty,* supra.) It seems to me to be preposterous to say that the river has been navigable to the western line of the state at any time in the past, and if it should be assumed to be navigable at Wichita where does navigability cease? That is not a question for judicial notice, but, as held in *United States v. Rio Grande Irrigation Co.,* supra, is a matter requiring evidence and to be determined by proof. There is as good reason, in my opinion, for holding that such rivers as the Neosho, Marais des Cygnes, Blue, Republican and Smoky Hill are navigable as the Arkansas in western Kansas, and yet it has been held in *Kregar v. Fogarty,* 78 Kan. 541, 96 Pac. 845, that the Smoky Hill river, although its banks were meandered, could not be assumed to be navigable.

The acts of admission referred to go no further than to declare that such tributaries of the Mississippi as were navigable should still be regarded as highways and remain open and free to all citizens of the western states. The title to the bed of the stream depends upon actual navigability, either past or present, and not on any mere potential or theoretical navigability. If the river was not actually navigable at some time in Reno county, according to the ordinary tests of navigability, the court can not assume that it is in this case. There is not one theory or rule for settling titles to land and another for the actual use of the stream as a highway of commerce. As said in *Kregar v. Fogarty,* supra: "There is no legal fiction that a stream not navigable

in fact is still to be held navigable as a matter of law. There is no such unseemly conflict between fact and law." (p. 547.)

I therefore dissent.

<hr>

### OPINION ON REHEARING.

*Per Curiam:* A rehearing was granted for the purpose of permitting the fullest possible presentation by the parties or others who might be interested in islands in the Arkansas river. We have again carefully considered the question and see no reason to change the former opinion and order of reversal, and they will therefore stand. Attention is called to *Park Commissioners v. Taylor,* 133 Iowa, 453, 108 N. W. 927, showing the extent to which the supreme court of Iowa has gone in holding that meandering is conclusive evidence of navigability.

JOHNSTON, C. J., dissents.

BENSON, J. (dissenting) : Upon further consideration following the reargument I am constrained to dissent from the majority opinion. Navigability in fact, either in the present or past, is indispensable to navigability in law. I do not find from the historical documents referred to in the opinion any evidence that the river was ever navigated above the confluence of the Little Arkansas, in any true sense of that term, whether considered with reference to early history or present conditions. Certainly it is not navigable in the sense approved in *Kregar v. Fogarty,* 78 Kan. 541, 96 Pac. 845. Whether it should be held navigable below the point just referred to depends upon the construction and effect of legislation, documents and history not applicable to the river above that point.

The whole course of the river in this state above the mouth of the Little Arkansas, in physical conditions and in history, is uniform. Matters tending to show

whether it is navigable at one point would be pertinent to the same question at every point. They are of such general notoriety as to be the subjects of judicial notice. I concur with the opinion of the majority, so far as it relates to this part of the river, that the question should not be left to uncertain and possibly conflicting verdicts, but do not concur in holding that it is navigable, either as a matter of fact or a proposition of law.

I concur generally in the views of the chief justice, but believe that the court should take judicial notice that the river is not navigable above Wichita or the mouth of the Little Arkansas. The question of its navigability below that point should not be decided in this case.